```
1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4    JASMINE RITTERSBACHER,      :

5           Plaintiff           :

6      vs.                      :

7    FOOD LION, LLC, et al.,    : CIVIL ACTION NUMBER:

8           Defendants          : ELH-20-2800

9              ---------------------

10

11        Videoconference Deposition of CORPORATE

12   DESIGNEE OF DEFENDANT FOOD LION, LLC, KEITH

13   PARLIER, taken on Friday, January 21, 2022, at

14   1:00 p.m., at CRC Salomon, 2201 Old Court Road,

15   Baltimore, Maryland, before Linda A. Crockett,

16   Notary Public.

17              ---------------------

18

19

20   Reported by:

21   Linda A. Crockett
```

EXHIBIT
F

Deposition of Keith Parlier                           Jasmine Rittersbacher vs. Food Lion, LLC, et al.

```
1    APPEARANCES:

2

3         LAWRENCE GREENBERG, ESQUIRE

4         Greenberg Law Office

5         6 East Biddle Street

6         Baltimore, Maryland 21202

7         (410) 539-5250

8             On behalf of the Plaintiff

9

10

11        JEREMY HUANG, ESQUIRE

12        Kiernan Trebach, LLP

13        711 St. Paul Street

14        Baltimore, Maryland 21202

15        (410) 415-1666

16            On behalf of the Defendant

17            Food Lion, LLC and

18            Kellermeyer Bergensons Services

19

20

21
```

```
 1    APPEARANCES CONTINUED:

 2

 3         JAMES O'BRIEN, ESQUIRE

 4         Anderson, Coe & King

 5         7 St. Paul Street, Suite 1600

 6         Baltimore, Maryland 21202

 7         (410) 752-1630

 8             On behalf of the Defendant

 9             Vane Service Cleaning

10

11

12

13

14

15

16

17

18

19

20

21
```

1    T H E   P R O C E E D I N G S

2            - - - - - - - - - - - - -

3                 STIPULATIONS

4    It is stipulated and agreed by and between

5    counsel for the respective parties that the

6    reading and signing of this deposition by the

7    witness is hereby not waived.

8            - - - - - - - - - - - - -

9                 KEITH PARLIER,

10   first duly sworn to tell the truth, the whole

11   truth, and nothing but the truth, testified as

12   follows:

13        EXAMINATION BY MR. GREENBERG:

14        Q.  Good afternoon.  Is your last name

15   pronounced Parlier?

16        **A.  Yes.**

17        Q.  Mr. Parlier, my name is Lawrence

18   Greenberg, or Larry Greenberg, I represent

19   Jasmine Rittersbacher for the incident where she

20   slipped and fell in the Food Lion store on June

21   of 2019.  Nice to meet you.

Case 1:20-cv-02800-JMC   Document 63-8   Filed 04/28/22   Page 5 of 97

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    **A.   Nice to meet you.**

2    Q.   You are here today in response to what's

3    called a Notice of Deposition that my office

4    filed, and it was entitled for the corporate

5    designee of Food Lion; do you understand that?

6    **A.   I do.**

7    Q.   Have you seen it?

8    **A.   I have.**

9    Q.   And so I guess let's start off.  Please

10   state your full name for the record.

11   **A.   Keith Allen Parlier.**

12   Q.   What is your date of birth?

13   **A.   12-31-1970.**

14   Q.   Have you ever been deposed before?

15   **A.   I have.**

16   Q.   First of all, how many times have you

17   been deposed?

18   **A.   Roughly -- 20 times, roughly.**

19   Q.   Holy, that's more than I've ever done in

20   my whole life.  That's not true.  And in what

21   context were you deposed; was it on behalf of

Deposition of Keith Parlier                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1   Food Lion or other companies?

2       **A.   It was on behalf of a subsidiary of ours**

3   **at the time, Bottom Dollar Foods.**

4       Q.   I'm sorry, one more time?

5       **A.   It was on a subsidiary of ours, Bottom**

6   **Dollar Foods, which was a part of Food Lion at**

7   **one time.  So I was the corporate designee at the**

8   **time.**

9       Q.   So this is by way of Zoom.  And

10  presumably on your screen you have multiple

11  boxes.  Hopefully you have five, correct?

12      **A.   That is correct.**

13      Q.   One of the boxes is Linda Crockett who

14  is the court reporter.  Ms. Crockett needs to

15  make sure, twofold, number one that she can hear

16  you, and so far I haven't had any problems.  But

17  she also needs to make sure that she can type it

18  all down later.  And now it is being recorded.  I

19  see the red button that says recorded, or

20  recording.  Sorry.  Bear with me.  But even

21  though you've been deposed more times than all of

1   us, I want to go over ground rules to make sure

2   that I know you understand how this is supposed

3   to go.  Is that fair?

4       **A.   That's fair.**

5       Q.  All right.  Again, so far I've not

6   observed this from occurring, but please let's

7   try not to talk over each other.  I will ask a

8   question and hopefully you will give an answer.

9   Counsel may object to it or not, but at some

10  point it will be that question/answer.  If at any

11  point you need to go on and you need to explain

12  something, please do.  But I don't want to talk

13  over you and please don't talk over me.

14          If at any time I use a word or a phrase

15  that you may not understand or you don't hear,

16  please stop me and say, Larry or Mr. Greenberg or

17  whatever words you want to call me, just stop me

18  and I will rephrase it, because I want to make

19  sure that if I ask a question and you answer that

20  question, that you understood what you were

21  answering.  Does that sound fair?

1     **A.   Yes, it does.**

2     Q.   All right.  If you're like me and you

3     use hand gestures or say words like uh-huh or

4     huh-uh or other colloquialisms, please don't do

5     that.  Just be clear so that I make sure I

6     understand what your appropriate answer is.  Also

7     if there comes a time in, Madam Reporter is

8     usually very good at letting us know, if you say

9     a name or you say something that she's not sure,

10    at some point she may come back and say

11    Mr. Parlier, you said something.  How is that

12    spelled or what was that actual word.  Okay?

13    **A.   Okay.**

14    Q.   And I'm usually pretty good at watching

15    her as we go forward, you know, to see if she

16    doesn't hear something so that I can stop it

17    then.  If you need to take a break, this should

18    not be that long, but if for some reason you need

19    to take a break during this, please let me know.

20    The only exception is if I ask a question, you

21    need to answer it first and then you can take a

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1  break.  Do you understand?

2      **A.  Yes.**

3      Q.  All right.  Are you currently on any

4  medication that would prevent you from testifying

5  truthfully today?

6      **A.  No.**

7      Q.  Is there anything physical or emotional

8  or mental that would prohibit the same?

9      **A.  No.**

10     Q.  Any reason as we sit here now that you

11  can think of that you're not prepared to testify?

12     **A.  No.**

13     Q.  And you understand you're here to tell

14  the truth?

15     **A.  Yes.**

16     Q.   And you understand that your attorney

17  is here and that the attorney represents both

18  Food Lion and Kellermeyer?

19     **A.  Yes.**

20     Q.  What have you done to prepare for

21  today's deposition?

1       **A.   Just conversations with the Food Lion**

2   **lawyer, Mr. Huang.**

3       Q.   And in addition to conversations with

4   him, have you reviewed any documents?

5       **A.   I have.**

6       Q.   And what did you review?

7       **A.   I reviewed I believe it was called the**

8   **second amendment.**

9       Q.   Complaint?

10      **A.   Complaint.   And also some logs from the**

11  **store stating work logs.**

12      Q.   And what were the work logs that you

13  reviewed?

14      **A.   It was just pertaining to work orders**

15  **that were entered in for repairs inside of the**

16  **store.**

17      Q.   And repairs to what?

18      **A.   It was several things.   Possible, you**

19  **know, a leak in the roof, you know, just any kind**

20  **of physical repair throughout the store.**

21      Q.   All right.   Have you reviewed any work

1   logs or repair orders relating to the, I'll call

2   it refrigeration unit where this occurred in

3   front of.  When I say this, I'm talking about the

4   slip or -- I'll call it a slip because the carpet

5   moved, the rug moved.  Do you know where that

6   occurred in the store?

7       **A.   I do.**

8       Q.   Okay.  And where did it occur?

9       **A.   In front of the floral case.**

10      Q.   Floral vase?

11      **A.   Case.   C-A-S-E, case.**

12      Q.   Sure.  And that case is a refrigerated

13  unit, correct?

14      **A.   Yes.**

15      Q.   And that refrigerated unit, do you know

16  how long that unit in particular has been in your

17  Food Lion store that this occurred?

18      **A.   I do not.**

19      Q.   All right.  And do you have documents

20  that would reflect how long that particular case

21  has been in the store?

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1      **A.   I personally do not, no.**

2      Q.   Do you know who would have documents?

3      **A.   I would imagine that would be our**

4      **corporate level for the contracting of the**

5      **building.   Or the construction of the building.**

6      **I'm sorry.**

7      Q.   So do you believe as we sit here that

8      that unit has been in there since the Food Lion

9      went in, it was constructed and built?

10     **A.   That's something I could not answer.**

11     Q.   For the purposes of the deposition I

12     will call that floral unit the unit, all right,

13     so that I don't have to keep saying the floral

14     refrigerated unit, I will just call it the unit.

15     **A.   All right.**

16     Q.   You would agree that Ms. Rittersbacher

17     slipped on a rug or mat that was directly in

18     front of that unit?

19     **A.   Based on the complaint, yes.**

20     Q.   Have you any independent knowledge about

21     the incident that occurred where my client got

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    hurt?

2        **A.   The only knowledge I have is based on**

3    **what my assistant manager at the time had spoken**

4    **with me about.**

5        Q.   And his -- I'm sorry.  Go on.

6        **A.   And the report that was entered.**

7        Q.   Okay.  We'll get to the report in a

8    second.  Who was your assistant manager at the

9    time?

10       **A.   Logan Webb.**

11       Q.   Would that be Logan Fox?

12       **A.   Or Fox, I'm sorry, yes, Logan Fox.**

13       Q.   That's okay.  And do you know Mr. Fox?

14       **A.   Through work, yes, I do.**

15       Q.   How long have you known Mr. Fox?

16       **A.   Since I was put in that location.  I was**

17   **put there in 2018, I believe it was.  And that's**

18   **when I was introduced to him.**

19       Q.   Okay.  And so the first time at that

20   location was 2018 and this incident occurred in

21   2019.

Deposition of Keith Parlier                        Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1      **A.   Yes.**

2      Q.   So you would have been there at least

3  for somewhat of a year before?

4      **A.   Approximately, yes.**

5      Q.   Okay.  And are you aware that Mr. Fox's

6  deposition was already taken?

7      **A.   I became knowledgeable of that, yes.**

8      Q.   Did you review it, watch it?

9      **A.   No, I did not.**

10     Q.   Did you talk to Mr. Fox about his

11  testimony?

12     **A.   No, I have not.**

13     Q.   Do you have any idea what Mr. Fox said

14  from any source?

15     **A.   No, I do not.**

16     Q.   Okay.  Are you aware that there was a

17  video that actually shows Ms. Rittersbacher

18  slipping on that rug and falling?

19     **A.   From the knowledge I've gained from**

20  **our -- Mr. Huang, yes, there is a video.**

21     Q.   Okay.  Have you seen the video?

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    **A.   I have not.**

2        Q.   So one of the things in the deposition

3    notice is to talk about that video as well.   So

4    you haven't seen the actual video, but you are

5    aware that there was a camera in the -- what do

6    you call that area?

7        **A.   The produce department.**

8        Q.   The produce department.   Are you aware

9    that there was a camera in the produce department

10   on the day she got hurt?

11       **A.   From what I can remember at that**

12   **location, there is a camera.   I cannot remember**

13   **if it was pointed directly into the produce**

14   **department or if it was just pointed in the**

15   **vicinity of that area.   But I do know there are**

16   **cameras inside of the store.**

17       Q.   What is the purpose -- strike that

18   question.   That camera is used in the normal

19   course to observe everything that goes on, as you

20   said, in that general vicinity of the produce

21   department?

1    **A.    You broke up on that one.    Could you**

2    **repeat?**

3        Q.    Sure.    I said are you aware in the time

4    you were there since 2018 that that camera is

5    used in the normal course of business to record

6    the activities that go on in that Food Lion store

7    in that produce department area?

8        **A.    That is correct.**

9        Q.    Okay.    By the way, did you assist in

10    answering discovery in this case, and that would

11    be interrogatories and request for production of

12    documents?

13        **A.    No, I did not.**

14        Q.    All right.    I want to show you a

15    document.    Bear with me.    Hold on one sec.    Can

16    you see on the screen where it says, there's a

17    signature, and Jeremy, maybe you're able to help.

18    Can you tell me who signed on behalf of the

19    company?

20        MR. HUANG:    This is for Kellermeyer

21    Bergensons.

Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1      MR. GREENBERG:  I'm sorry.  I opened up

2  the wrong one.  Jeremy, who signed on behalf of

3  so I don't have to pull it up?

4      MR. HUANG:  I would need to check on

5  that.  I would need to look at the -- the window

6  is maximized.  Let me check on this.

7      MR. GREENBERG:  No problem.  Jeremy, do

8  you mind if I go on while you're looking for

9  that?

10     MR. HUANG:  No.  Go ahead.

11     MR. GREENBERG:  Because that wasn't

12 listed.  That's why I asked.

13 BY MR. GREENBERG:

14     Q.  All right.  Mr. Parlier, you did not

15 assist in any way in answering the discovery in

16 this case?

17     **A.  No, I did not.**

18     Q.  Just briefly, did you prepare a list or

19 a memo of facts or talking points to help you

20 prepare for this?

21     **A.  Nothing written down, no.  Just observed**

1  a little bit of information that was provided to

2  me based on the second amendment questioning and

3  also the files that Mr. Huang had sent to me, the

4  work orders.

5       Q.   I'm trying to pull up one more thing.

6  Bear with me.  We'll go down each one later.  How

7  far did you go in school?

8       A.   Two years of college.

9       Q.   Have you ever been arrested?

10      A.   I have.

11      Q.   What were you arrested for, sir?

12      A.   It was for discharging a firearm within

13  50 feet of a road.

14      Q.   Got you.  Were you convicted?

15      A.   No, I was not.

16      Q.   Any other convictions?

17      A.   No.

18      Q.   All right.  And how long have you been

19  with Food Lion?

20      A.   20 -- just over 20 years.

21      Q.   So you've done about a deposition a

1  year?

2      **A.   I guess if you break it down that way,**

3  **yes.**

4      Q.   And so if you go back to that, because

5  you said you did about 20, were the depositions

6  that you gave for personal injury similar to what

7  we're here for today?

8      **A.   Yes, they were.**

9      Q.   Have you ever given a deposition for

10  this store that Ms. Rittersbacher was injured?

11      **A.   No, I have not.**

12      Q.   And likewise, if you haven't done it for

13  this store, have you done it as a result of

14  somebody slipping in the produce department near

15  that floral unit?

16      **A.   In that particular store?**

17      Q.   Yes.

18      **A.   No, I have not.**

19      Q.   So in other stores, based on the way you

20  just phrased that, have you given deposition

21  specifically relating to somebody slipping and

1  falling near one of these refrigerated units?

2      **A.   No, I have not.**

3      Q.   Okay.   Have you ever done it where

4  somebody slipped and fell in the produce

5  department?

6      **A.   That I cannot recall.   It's been, like I**

7  **said, a lot of depositions I went through in a**

8  **short period of time.**

9      Q.   Sure.   Okay.   What is the relationship

10 between Food Lion and Retail Business Services

11 LLC, which I will call RBS?

12     **A.   RBS is a partner of Food Lion that helps**

13 **us with our operations inside of the retail.**

14     Q.   How do they help?

15     **A.   They are the ones that do our product**

16 **ordering.   From my understanding, it's a lot of**

17 **the programs that we had at Food Lion went over**

18 **to RBS when we merged a couple years ago.**

19     Q.   Does RBS have anything to do with fixing

20 these units, refrigerated units?

21     **A.   That I cannot answer.**

1      Q.  Okay.  Do they have anything to do with

2 hiring companies to bring mats in?

3      **A.  Again, I wouldn't know if that went**

4 **through RBS or if it went through Food Lion, so I**

5 **couldn't answer that.**

6      Q.  Okay.  What's the relationship between

7 Food Lion and Kellermeyer?

8      **A.  Kellermeyer is the floor service crew,**

9 **correct?  If I'm remembering correctly.**

10      Q.  I'm leaving it up to you.  You're the

11 one that's been designated as the expert for

12 topics.

13      **A.  Kellermeyer Bergensons, so, yes, they**

14 **would be a floor service crew.  I see their full**

15 **name on the paper.  Kellermeyer Bergensons would**

16 **be a floor service crew so they would be the ones**

17 **that they would contract out to provide floor**

18 **service inside of the stores.  Just to clarify,**

19 **we refer to them at store level as Bergensons and**

20 **not Kellermeyer.  That's why it's confusing.**

21      Q.  So I will call them Bergensons instead

1    of KBS, because RBS, KBS, so I will call them

2    Bergensons.

3         **A.   Okay.**

4         Q.   What is your understanding or what if

5    any communications did you have -- let me back up

6    a second.  What's your title at Food Lion?

7         **A.   I am currently a regional recruiter.**

8         Q.   And what does that do; what are your

9    duties?

10        **A.   Recruit new people to the organization**

11   **and also work with current associates who want to**

12   **progress through the organization.**

13        Q.   Are you responsible for training as

14   well?

15        **A.   I am not.**

16        Q.   Who does the training?

17        **A.   That would be inside at the store**

18   **levels.**

19        Q.   So in this store in 2019, who was in

20   charge of training associates to make sure that

21   the areas are clean and safe for the public?

1    **A.   So in each store, depending on the**

2    **department you work in, the department manager is**

3    **responsible for the associate's training, and the**

4    **assistant manager and the store manager are there**

5    **to oversee that the associate is receiving the**

6    **training that they're supposed to receive.**

7        Q.   Do you know who the department manager

8    for the produce department was, that is included

9    in where the floral display was, correct?

10   **A.   Yes.**

11       Q.   Okay.  Do you know who the department

12   manager of the produce department was within six

13   months before this incident occurred?

14   **A.   Her name was Karlene, K-A-R-L-E-N-E.   I**

15   **believe her last name was Rhoden, R-H-O-D-E-N, if**

16   **I remember correctly.  I may be wrong on the last**

17   **name, though.**

18       Q.   Is Ms. Rhoden or Karlene someone, is she

19   still an employee of Food Lion?

20   **A.   She is.**

21       Q.   Do you know where she is located now?

1       **A.   She is still located at that store.**

2       Q.   All right.  And is she still in charge

3   of training?

4       **A.   In the produce department, yes.**

5       Q.   All right.  Are you aware that soon

6   after Ms. Rittersbacher fell and injured herself,

7   that she contacted the store to explain -- the

8   store already knew.  They were there.  But

9   contacted to talk to the store about what

10  happened?

11      **A.   I was not aware of that, no.**

12      Q.   All right.  Do you know who she would

13  have spoken with when she called?

14      **A.   No, I do not know who she spoke with.**

15      Q.   Okay.  Are you aware, based on your

16  review of the incident, that it was immediate

17  that somebody came upon and saw that in fact

18  there was something like slippery, slimy

19  underneath the mat that caused it to slide and

20  that's when she fell and went down on her knee?

21          MR. HUANG:  Objection to form.

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1          MR. O'BRIEN:  Objection.

2       Q.  Okay.  Are you aware that there was

3    something slippery under the rug that caused it

4    to move and she fell?

5       **A.  I'm aware that she fell based on the**

6    **fact -- I don't know if it was a fact.  But based**

7    **on there was the assumption that there was**

8    **something under the rug.**

9       Q.  Okay.  When we say assumption, prior to

10   today, have you seen the pictures that were taken

11   by store personnel of the rug pulled back?

12      **A.  I have not seen them, no.**

13      Q.  Okay.  Mr. Parlier, it's been a pleasure

14   talking with you.  But when you reviewed the

15   deposition notice, which I will show -- which is

16   still on the screen; can you see it?

17      **A.  I can.**

18      Q.  Number 1, discuss matters raised in the

19   interrogatories and request for production of

20   documents.  That was my third, fourth question to

21   you, and you said you don't know and haven't

Deposition of Keith Parlier                              Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    reviewed them.   Produce the documents that were

2    prepared, you were aware specifically relating

3    to pic -- I'm telling you because pictures are

4    down lower.   Do you know why you were appointed

5    to be the corporate designee for Food Lion if you

6    don't have knowledge about these issues?

7        **A.   Due to the fact that I was the store**

8    **manager in the store at the time.**

9        Q.   Okay.   So maybe -- and this is more of a

10   legal possible issue, but one of the things that

11   is important, if we're going to take all of our

12   time, is that you are prepared to discuss these.

13   You may not have had personal knowledge at the

14   time.   But -- so the only thing you know is you

15   read an amended complaint and you looked at some

16   log records.   You don't know anything else; is

17   that accurate?

18       **A.   I have not seen pictures or videos of**

19   **what you have spoken to.   So no, I cannot speak**

20   **to those because I have not been provided with**

21   **those.**

1    Q.  All right.  And I asked questions

2   about -- well, I haven't gotten to it, but

3   training, and you don't do the training either,

4   correct?

5    **A.  Not the one-on-one training, no, I do**

6   **not.**

7    Q.  Okay.  Do you have any knowledge about

8   the maintenance and repairs for that individual

9   unit which is in the floral department where the

10  flowers were?

11   **A.  Based on what was provided to me and the**

12  **work order log that was provided to me, I've seen**

13  **no work order logs put in for that unit, so I**

14  **cannot speak to the repairs of the unit based on**

15  **what was provided to me.**

16   Q.  So you're not aware as we sit here that

17  the unit had been leaking water or some substance

18  and that a repair order was put in before or

19  after Ms. Rittersbacher was injured?

20   **A.  Not on what was provided to me, I did**

21  **not see that.**

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1     Q.  Okay.  Are you familiar with the safety

2   policies of the store?

3     **A.  I am.**

4     Q.  Okay.  Well, let's start there.  Do you

5   agree that Food Lion has an obligation to the

6   public to keep the store safe?

7     **A.  Yes.**

8     Q.  And you understand that although you

9   don't do the training, when somebody is hired,

10  they go through a bunch of company policies,

11  correct, and they have to review them?  I don't

12  know if they're tested on them.  You don't do the

13  training, so you may not know.  Do you agree that

14  there are corporate policies that an individual

15  employee is supposed to sign off on?

16    **A.  Yes, there is what we call**

17  **computer-based training that an associate will go**

18  **through on their first and second day of**

19  **training.**

20    Q.  Okay.  Just real quickly, that involves

21  pledge of honesty?

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1      **A.   Yes.**

2      Q.   Working off the clock?

3      **A.   Yes.**

4      Q.   Respect in the workplace?

5      **A.   Yes.**

6      Q.   Harassment discrimination?

7      **A.   Yes.**

8      Q.   Shoplifting -- I'm just going to go

9  down, gift and gratuities, food safety, open door

10  and appeal policy, acceptable use, performance

11  counseling, personal behavior, equal opportunity,

12  Family and Medical Leave Act, attendance and

13  punctuality, shoplifting, use of telephone, and

14  all those.  Does that sound about right?

15      **A.   That sounds accurate, yes.**

16      Q.   Okay.  And you would agree, and I did

17  not intentionally leave it out, but there's

18  nothing that talks about safety to customers.

19      **A.   What you were reading is actually talked**

20  **about during what we call their on-boarding which**

21  **is during the hiring process.  So those are the**

1  **things that are covered during that.  Their first**

2  **day of actual training is on the computer with**

3  **computer-based training where they get their**

4  **safety training.**

5       Q.  Are they trained if they -- if they see

6  an unsafe act or an unsafe area, that they are to

7  make sure that it causes or poses no threat to

8  anyone else including workers and the public?

9       **A.  You'll have to rephrase it.**

10      Q.  Sure.  If a worker comes upon a mat that

11  is wet or that has a substance underneath of it,

12  what should that worker do?

13      **A.  Our policies are if you see something**

14  **that is an unsafe area or condition or unsafe**

15  **act, you see something, you fix it, you say**

16  **something.**

17      Q.  All right.  Should they ever leave it

18  and just walk away from it?

19      **A.  Not according to our policies, no.**

20      Q.  All right.  And if they did, what would

21  happen to them?

1    A.   There would be store accountability with

2    that associate.   There would also be follow-up

3    training with them to make them understand you

4    walked by an unsafe condition.   You need to come

5    back.   We see something, we say something, we fix

6    it, and then continue training from there.

7    Q.   All right.   So you haven't seen the

8    video, correct?

9    A.   No, I have not.

10   Q.   And I'm not going to sit here and play

11   it.   But if I tell you the video shows

12   Ms. Rittersbacher slip, go down, sit there for a

13   lengthy period of time, EMTs come.   They take her

14   away.   And if I were to tell you that Mr. Fox

15   just leaves the area, doesn't put a sign down

16   or -- I'm sorry.   Doesn't cordon off the area to

17   prevent anybody from walking.   There was a sign

18   placed, I will tell you that, it was probably six

19   feet away.   But it did not distinguish what the

20   unsafe area was.   Is that appropriate?

21   A.   Based on what you're telling me, yes.

1    **And based on what I have been in discussion with**

2    **with our attorney, yes.**

3        Q.  You believe that is a safe thing to do?

4    I'm missing what you're saying.  Is that the

5    appropriate conduct of an assistant manager or

6    any employee for that matter to leave a dangerous

7    area?

8        **A.  Well, again, when you see something, you**

9    **fix it.  So what I would say is dependent on the**

10   **situation, he may have had to go and get a wet**

11   **floor sign to provide to that area right there.**

12       Q.  If the pictures show this substance --

13   which I will get now since you've never seen

14   them.  If it shows the wet substance, and I will

15   assure you, as an officer of the court, that the

16   only thing on the video that you see is Mr. Fox

17   look at it and then he lays it back flat down on

18   the ground, and then after Ms. Rittersbacher

19   leaves, he leaves the area.  Is that appropriate

20   conduct of an employee?

21       **A.  No, it should not be.**

1    Q.   Okay.   What should he have done

2  specifically on that day after she fell?

3    **A.   He should have gotten assistance and**

4  **secured the area until they could provide a safer**

5  **condition.**

6    Q.   Sure.   And how would, in this exact

7  instance, how would a safer area be made?

8    **A.   Based on the incident and based on what**

9  **you have provided information to me, if there's a**

10  **wet floor, the wetness of the floor, there should**

11  **be wet floor signs and the area should have been**

12  **mopped or a floor scrubber should have been ran**

13  **over top of it.**

14    Q.   I'd like to show you -- can you see that

15  picture, sir?

16    **A.   Yes, I can.**

17    Q.   And for the record, we're looking at

18  the photo -- the exhibit called photos, floor

19  photos 3.   Can you tell me what you're looking

20  at?

21    **A.   It looks to be the floor with a shiny**

Deposition of Keith Parlier Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1   substance and at the top a rug rolled up.

2       Q.   Okay.   And what is on the mat or rug

3   rolled up that you can see?

4       A.   A shiny substance.   I can't tell you

5   exactly what it is.   But it looks to be a wet

6   substance.

7       Q.   Okay.   So if I were -- okay.   So I want

8   to show you the picture before.   Bear with me.

9   Based on your knowledge back in 2019, was that

10  mat always in front of this refrigerated unit?

11      A.   Yes.

12      Q.   And do you know what the purpose, why

13  the mat was there?

14      A.   To prevent from water leakage.   It's in

15  front of bouquets.   So when bouquets are picked

16  up out of their buckets, there is water leakage,

17  and the mat is there to provide a place for the

18  water to soak.

19      Q.   Okay.   I'm sorry.   Say that again.

20      A.   So it's placed in front of the bouquets,

21  floral bouquets, so when a customer pulls floral

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1   **bouquets out of the bucket which is filled with**

2   **water, it provides an area for the water to drip**

3   **and not onto a tile.**

4        Q.   For the record, we're talking about

5   floor photo 2.  So my question is, you notice how

6   the mat is offset to the end of the unit, the

7   refrigeration unit?

8        **A.   Can you go back to the picture?  I**

9   **cannot see the picture.**

10       Q.   Oh, I'm sorry.  Can you see it?

11       **A.   Yes, I can see that.**

12       Q.   Okay.  So do you see where my mouse is

13   in the middle of the picture?

14       **A.   I do.**

15       Q.   Do you see that this is offset?  Like

16   what you just said makes sense.  There's sprayers

17   in the unit that water down the plants, correct?

18       **A.   No.**

19       Q.   Oh, so then explain to me how a

20   substance would get on the floor?

21       **A.   All right.  Don't move your mouse.  Do**

1   you see where your mouse is?

2       Q.   Yes.

3       A.   If you look at the items to the right

4   with the red, I would say red pots.

5       Q.   Terracotta, yes.

6       A.   Those are dry plants.  So they're not

7   cut bouquet.  To the left of your mouse, above

8   that is cut bouquets.  So cut bouquets are left

9   in floral buckets which are filled with water.

10  That is the area above the rug where the floral

11  bouquets is.  So that is where the customer would

12  pick up a wet item and that would possibly drop

13  onto the floor.

14      Q.   I got it.  So someone in the store,

15  whether it's you or the manager -- well, you were

16  the manager -- you know, based on past

17  experience, that customers would come up, pick up

18  the bouquet which does not have plastic

19  underneath, and as they pull it toward themselves

20  the water would drip down; is that what you're

21  saying?

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1   **A.   Yes.**

2      Q.   Okay.  So because of that, somebody

3   elected to put a mat there so that the water

4   hopefully wouldn't just go on the -- that's a

5   tile floor, I assume?

6   **A.   That is correct.**

7      Q.   Okay.  So it wouldn't go on the tile

8   floor.  It would at least, hopefully the majority

9   of it get onto that rug.

10  **A.   Yes.**

11     Q.   Okay.  In the history of the time that

12  you've been in that store or any other store,

13  have you also seen where they pick it up and they

14  go to the right and so the actual water drips on

15  the tile floor?

16  **A.   There has been incidents where the**

17  **customer moved too fast or just pulled it**

18  **straight out and water would get onto the tile.**

19     Q.   Mr. Parlier, are you aware that the

20  motor of this refrigeration unit is behind where

21  my mouse is.  It's in the back, but behind.

1    **A.   Roughly in that area, yes.**

2    Q.   So for the record, it is in the middle

3    of the rug -- what is that stand, by the way?  Is

4    that where they keep the plastic like Vs where,

5    when you take out flowers, you can put it in the

6    plastic so it doesn't continue to drip throughout

7    the store?

8    **A.   That is correct.**

9    Q.   In your experience, have you been aware

10   that customers come in and they don't put it in

11   that plastic.  They put it in their cart or in

12   their hand and it continues to drip as they walk

13   away.

14   **A.   Yes, that does happen.**

15   Q.   Okay.  So let's go back.  For the

16   record, exhibit that would be 3, but floor

17   photo 2, the actual mechanism, the motor is

18   directly below where those fresh plants are,

19   correct?

20   **A.   Again, yes, roughly in that area, yes.**

21   Q.   Okay.  Thank you.  Do you agree that

 1   safety is everyone's job?  You can't -- let's

 2   stop there.  Do you agree that safety is

 3   everyone's job?

 4           MR. HUANG:  Objection.

 5           MR. O'BRIEN:  Objection.

 6      Q.  Employees, let's start there.

 7           MR. O'BRIEN:  Objection.

 8      Q.  You can answer.  Unless your lawyer

 9   tells you not to answer, you can answer.

10      **A.  Yes, that is everyone's responsibility.**

11      Q.  All right.  And I know you hire a

12   company who comes in and does the cleaning, the

13   mopping and the buffing, correct?

14      **A.  Yes.**

15      Q.  And do you know who that is?

16      **A.  What we do is we would clock them in.**

17   **When we say clock them in, to let corporate know**

18   **that they are there, and it would be under**

19   **contract services under Bergensons.**

20      Q.  Okay.  So Bergensons, would they do the

21   actual work or would they hire somebody to do the

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1  work?

2      **A.   That's really a contract with**

3  **Bergensons.   I know there are instances where**

4  **they hire subcontractors to come into the stores**

5  **to do the work.**

6      Q.   All right.   And one of the topics on the

7  expert designation is to talk about

8  subcontractors, and one in particular called

9  Vane.   Have you ever heard of Vane Cleaning

10  Services?

11      **A.   No, I have not.**

12      Q.   All right.   I'd like to show you -- can

13  you see the screen?

14      **A.   I can.**

15      Q.   All right.   And for the record, this is

16  photos-floor photo number 4.   Can you tell me

17  what we're looking at there?

18      **A.   It's the rug rolled up in front of the**

19  **floral unit.   I can see what appears to possibly**

20  **be a wet substance on the rug.**

21      Q.   All right.   On the rug and on the floor?

1      A.  I really can't tell if it's on the floor

2  because of the way the light is reflecting off

3  the tile.

4      Q.  I just zoomed in.  Is it easier for you

5  to see the substance on the floor?

6      A.  Yes.  It appears to be a substance on

7  the floor.

8      Q.  How would you describe that substance?

9      A.  I would just say it's a shiny substance,

10  possibly a wet substance on the floor.

11      Q.  And in the history of the time that you

12  worked in this store, have you been aware of a

13  substance like this under that mat before, or in

14  that general area?

15      A.  No.

16      Q.  All right.  I'd like to show you what is

17  marked photos area 2.  Can you tell me what we're

18  looking at here?

19      A.  That is the produce department.

20      Q.  Okay.  And is that the produce

21  department as it looks now?

1     **A.   That is how it looks now, yes.**

2     Q.   All right.   And it was changed about a

3     year and a half ago; is that about right?

4     **A.   Yes.**

5     Q.   All right.   And specifically do you see

6     a wet floor sign?

7     **A.   I do.**

8     Q.   And do you see beneath the wet floor

9     sign a bunch of rags?

10    **A.   Yes, that's what it appears to be.**

11    Q.   Would you agree with me, as we sit here

12    right now, that that's the exact same unit that

13    housed the flowers when Ms. Rittersbacher was

14    hurt?

15    **A.   No, it is not.**

16    Q.   That's not the same unit?

17    **A.   No, it is not.**

18    Q.   Okay.   Okay.   Do you know why there

19    are -- there's a wet floor sign and rags

20    underneath the unit?

21    **A.   I cannot speak to why it's there, no.**

1    Q.  Okay.  And is that an appropriate way to

2  clean up a danger, obviously something wet on the

3  floor?

4    **A.  No.**

5    Q.  Okay.  What is the appropriate way to

6  clean up if the unit is leaking?

7    **A.  To be sure that all of the water is up**

8  **off the floor and inspect and fix, and if it**

9  **meant providing a maintenance work order, to**

10  **enter a work maintenance work order.**

11    Q.  Okay.  Bear with me.  Hold on one

12  second.  You would agree with me in that picture

13  there is not a mat, correct?

14    **A.  No, there is not.**

15    Q.  All right.  Is it appropriate to have

16  mats down all the time?

17    **A.  In certain areas of the produce**

18  **department, yes.**

19    Q.  Why?

20    **A.  Because of the possible water leakage in**

21  **front of certain areas.**

1    Q.   Okay.  And the benefit of that you told

2  me if somebody grabs, which you're aware of, if

3  somebody grabs it and goes to put it either in

4  their cart or in their hands, that it would stop

5  the minor leak or stop the leaking coming off,

6  correct?

7    **A.   Correct.**

8    Q.   Okay.  And the -- so in that picture I

9  showed you which was area 2, clearly there was a

10  substance on the ground, and one of your

11  employees just put a wet sign down and then it

12  looks like they just took towels or paper towels

13  and just put it there to try to stop the leak,

14  correct?

15   **A.   In that picture that would be the**

16  **assumption.**

17   Q.   Okay.  What company provides mats to

18  Food Lion?

19   **A.   I cannot remember the name of the**

20  **company that provides the mats.**

21   Q.   Are your employees trained on the use of

1    mats?

2         **A.   They are trained on where the mats**

3    **should be located, yes.**

4         Q.   All right.  Do you agree that mats in

5    general just add another layer or another hazard

6    to consumers?

7              MR. O'BRIEN:  Objection.

8              MR. HUANG:  Objection.

9         **A.   No.**

10        Q.   Let me break it down then.  Do you agree

11   that mats can get substances underneath which

12   makes them slippery on a tile floor?

13        **A.   No.**

14        Q.   If a substance gets under a mat, you

15   don't believe that it can be slippery underneath?

16        **A.   You would have to break down a**

17   **substance.  Because that can be very general in**

18   **that question.**

19        Q.   Okay.  Sure.  A substance like the one I

20   showed you the day that Ms. Rittersbacher was

21   injured, which was exhibit floor photo 4.  I can

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1   show it to you again.  Hold on.

2        **A.   I remember the photo.**

3        Q.   No.  Let me go back.  Do you see the

4   substance on the floor and on the mat or rug?

5        **A.   Yes.**

6        Q.   So if that substance exists that

7   makes -- do you believe that it makes that mat

8   dangerous because it can move?

9        **A.   It makes the mat not provide the safety**

10  **that it's supposed to provide.**

11       Q.   So mats in general can warp over time.

12  The edges can raise up, correct?

13       **A.   If you have a mat too long, yes, that**

14  **could happen.**

15       Q.   All right.  Mats in general can get

16  sticky which could cause somebody to trip?

17       **A.   They could.**

18       Q.   All right.  So if we go no further,

19  would you agree then that mats just add another

20  hazard versus just a clean floor, a clean safe

21  floor?

1       MR. O'BRIEN:  I'm going to object.  You

2   can ignore me, my objections.

3       THE WITNESS:  I'm sorry.  I thought it

4   was Jeremy that said that.  I wasn't looking at

5   the camera.

6       **A.   Can you reask the question.**

7       Q.   Sure.  I gave you three examples.  The

8   mats could get worn and torn, they could pull up

9   which is a tripping hazard, they could get a

10  substance underneath of them which makes it a

11  slipping hazard, or they could get a substance on

12  top of them which could be both a tripping or

13  slipping hazard; would you agree?

14      MR. O'BRIEN:  Objection.

15      **A.   If the mats are not being used properly**

16  **and not kept clean and are old, yes, that could**

17  **happen.**

18      Q.   Okay.  Would you agree that, again, the

19  safest thing is not to have a mat at all as long

20  as there's precautions to, you know, in place to

21  stop water from getting onto the floor?

1          MR. O'BRIEN:  Objection to form.

2          MR. HUANG:  Objection to form.

3     **A.   Can you rephrase it?**

4     Q.   Listen.  Less is more, is it not?  And

5  I'm just -- it's just common sense.  I'm asking

6  if you had your way, would you agree that safer

7  is not to have anything on the floor?

8          MR. O'BRIEN:  Objection.

9          MR. HUANG:  Objection.

10    **A.   No, I would not.**

11    Q.   Okay.  Do you have any idea how often

12  the mat in exhibit 4, floor photo 4 was lifted

13  and cleaned underneath before Ms. Rittersbacher

14  fell?

15    **A.   Those mats should be lifted and cleaned**

16  **underneath every day when the floor service crew**

17  **comes in and provides floor service.**

18    Q.   All right.  So you don't know who was

19  doing the floor service at the time.  You just

20  know that Bergensons was hiring or possibly doing

21  it themselves, correct?

Deposition of Keith Parlier

Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    **A.   Correct.**

2    Q.   All right.  Are you aware within Food

3    Lion that there is a -- like a form that says

4    every time the mat is cleaned or lifted or

5    replaced?

6    **A.   There is no form, no.**

7    Q.   Do you know in bathrooms in some

8    establishments there is a chart on the door which

9    shows half hour or hourly increments where

10   somebody comes in and cleans it?

11   **A.   Yes, I've seen them.**

12   Q.   Does your store have that?

13   **A.   We do have what we call QA cleaning list**

14   **that our quality assurance, which is our**

15   **housekeeper, follows each morning and each**

16   **evening.**

17   Q.   Okay.  Now, I'm talking in between,

18   because in certain areas, a bathroom, a produce

19   section, where things can roll off or water can

20   come out, I'm talking do you have any signs where

21   you mandate your employees to go and check to

Office (410) 821-4888
CRC Salomon, Inc.

2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com

Facsimile (410) 821-4889
Page: 49

1  make sure that there's not a squished banana on

2  the floor or a unit is not leaking or people

3  haven't taken 50 flowers away and there's a whole

4  line of water.  Do you have any documents like

5  that to reflect this cleaning?

6  **A.  No, we do not.**

7  Q.  Do you agree that having that could

8  prevent injuries to the public?

9  MR. O'BRIEN:  Objection.

10  MR. HUANG:  Objection to form.

11  **A.  Answer?**

12  Q.  Yes.  Unless Jeremy tells you not to.

13  **A.  All right.  What I would say is as long**

14  **as the checklists are followed and followed**

15  **correctly and everybody is trained, and it**

16  **narrows down every detail of everything that**

17  **happened, then, yes, they could be beneficial.**

18  Q.  Okay.  Thank you.  The reason I -- the

19  main reason I ask is because you told me bookends

20  where a vendor comes in and cleans and that's the

21  morning and that's the evening, right?

1      **A.   No.   No.   You may have misunderstood.**

2   **We have associates in the store called quality**

3   **assurance that work for Food Lion that have**

4   **cleaning logs in the morning and then one in the**

5   **evening.   That's what we do inside of our stores**

6   **that have checklists.   You asked for checklists.**

7   **Those are our checklists.   There is nothing**

8   **during the day and there is no checklist for the**

9   **floor service crew that comes in and provides the**

10  **floor service to us.**

11     Q.   I thought that's what I just said.   But

12  understanding that, you would agree with me that

13  people, your customers come in throughout the day

14  and that's when things can drop, that's when

15  things can spill, correct?

16     **A.   Yes.**

17     Q.   Okay.   And yet there's nothing when you

18  have customers in the store to assure that

19  somebody is going around and making sure that

20  things like this don't happen?

21     **A.   We do not have a checklist, no.**

Deposition of Keith Parlier                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1      Q.   Okay.  Do you know how often in 2019,

2  June specifically, mats were changed?

3      **A.   The company that provides the mats to us**

4  **comes in weekly and they are to observe and**

5  **change out accordingly to any kind of wear, tear,**

6  **or any kind of inability to clean.**

7      Q.   All right.  And is there a document that

8  you're aware of that would have this information

9  when that particular mat was changed?

10     **A.   No.**

11     Q.   Or cleaned?

12     **A.   No.**

13     Q.   Okay.  Mr. Parlier, can you still see

14  number 4?

15     **A.   Yes.**

16     Q.   Can you tell me where that slimy

17  substance came from?

18         MR. O'BRIEN:  Objection.

19         MR. HUANG:  Objection.

20     **A.   Based on that picture I cannot tell you**

21  **where that substance came from.**

1    Q.  All right.  Do you know if that

2  substance was created by the cleaning company the

3  night before?

4    **A.  I cannot speculate where it came from.**

5  **I cannot speculate how it got there.  If I**

6  **provided any information it would be a**

7  **speculation.**

8    Q.  Sure.  The one thing I will ask, do you

9  have any information that my client had anything

10  to do with that substance on the floor and under

11  the mat?

12    **A.  I do not have any information saying**

13  **that.**

14    Q.  Okay.  And nobody, none of your workers,

15  like see this guy right here bending over who

16  pulled up the mat?

17    **A.  Yes.**

18    Q.  Do you know who that is?

19    **A.  I do not.**

20    Q.  Let me see if there's a better picture.

21  Give me a sec.  So you don't know who it is?

1      **A.   No, I do not.**

2      Q.   And other than this computer-generated

3    training, is there any other ongoing training

4    relating to what an employee is supposed to do to

5    keep the store safe?

6      **A.   Yes, again, it's a matter of see**

7    **something, say something.  And it's a matter of**

8    **if an associate recognized, by not providing see**

9    **something and say something with the unsafe**

10   **condition, then it would be a coaching moment and**

11   **a training moment with that associate to make**

12   **sure we provide proper, safe conditions to our**

13   **customers.**

14     Q.   So you were the manager on the date that

15   Ms. Rittersbacher hurt herself?

16     **A.   I was the store manager at the time,**

17   **yes.**

18     Q.   All right.  As your job as manager, did

19   you talk to any witnesses?

20     **A.   I did not.**

21     Q.   Did you talk to Logan Fox on that day?

Deposition of Keith Parlier                      Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    **A.   I did not.**

2    Q.   Did you go back and look at the video to

3    see what happened?

4    **A.   I did not.**

5    Q.   For quality assurance purposes, did you

6    go back and look or talk to anyone to see if

7    Mr. Fox did the right thing?

8    **A.   I followed up with him to make sure he**

9    **provided all of the proper information to**

10   **corporate that they had asked for, if they had**

11   **asked for anything, and make sure he filed an**

12   **incident report.**

13   Q.   When did you find out about this

14   incident?

15   **A.   If I remember correctly, and this is,**

16   **again, a couple years ago, so I'm trying to**

17   **recollect, I believe I was on vacation during**

18   **this incident and I found out about it when I got**

19   **back.**

20   Q.   So who was the manager on duty that day

21   instead of you?

1    **A.   It would have been Logan.**

2    Q.   Oh, Logan was the manager?

3    **A.   Yes.**

4    Q.   Okay.  So when you got back, other than

5    literally 20-plus minutes ago, or maybe 40

6    minutes ago at this point, when I told you that

7    based on watching the video it appears that Logan

8    lifted the mat and that gentleman -- I can tell

9    you that that gentleman in the picture whose arm

10   it was is not Logan.  But at least two people who

11   were employed by Food Lion pulled up the mat, saw

12   that substance, laid it back down, and other than

13   putting a sign, you know that yellow cone sign

14   that we saw in another picture, left it and

15   walked away.  Is that appropriate?

16   **A.   Based on what you have told me, yes.**

17   Q.   Yes, it's appropriate?

18   **A.   You are asking what they did is**

19   **appropriate?**

20   Q.   Is what they did appropriate, pulling it

21   up, not cleaning it, and putting it back down and

1  leaving?

2       **A.  No, that should not happen.**

3       Q.  I can assure you it is extremely boring,

4  but you should have reviewed the video before I

5  got here.  I would assure you that if I misspoke

6  on what the video actually shows, counsel would

7  be objecting and telling me that.  But if you

8  want me to play it for you, let me know and I

9  will show it to you beginning to end.

10      **A.  No.  We're good based on Jeremy's**

11  **non-objections.**

12      Q.  That's fine.  And understanding that,

13  should you, as manager, have learned that soon

14  after you got back from vacation and done

15  something to Mr. Fox?

16      **A.  What do you mean I should have done**

17  **something?**

18      Q.  Well, you said there was a disciplinary

19  feature to employees if they don't see something

20  and say something or handle it appropriately.

21  It's my understanding that you do something as a

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    manager.

2         **A.   We coach.   We coach the associate on**

3    **better responses to unsafe conditions.   We**

4    **constantly coach associates on how to handle**

5    **unsafe conditions, and if it's an issue that we**

6    **felt that an associate purposely and knowingly**

7    **created an unsafe condition, then yes, there**

8    **possibly could be some disciplinary action.**

9         Q.   Mr. Parlier, do you have any idea how

10   many times before -- I don't know the exact time,

11   I think it was in the afternoon around 5

12   something, how many times somebody else slipped

13   on that area and just went on, you know, nobody

14   cleaned it, nobody removed the mat?

15        **A.   No, I do not.**

16        Q.   Have you spoken to Mr. Fox since that

17   day about this incident?

18        **A.   No, I have not.**

19        Q.   I'm not just talking like getting ready

20   for this deposition.   You never knew -- he never

21   came to you and said a woman fell in the produce

1   section when you were gone?

2        A.   When I returned, yes, we did speak.   He

3   told me there was a customer incident.   And I had

4   asked him if he followed all safety precautions,

5   make sure that the customer was safe, make sure

6   the incident report was entered in through our

7   computer system.

8        Q.   Okay.   So you never -- those are two

9   good questions.   But you never asked him, did you

10  fix it?

11       A.   Again, two and a half years ago I cannot

12  say whether I did or did not.

13       Q.   How is it that you remember the first

14  two questions you mentioned but you can't

15  remember safety to the public?

16       A.   Because one thing I always make sure of,

17  whenever there's an incident inside of a store,

18  regardless whether it's a customer incident or an

19  associate incident, that the manager who is

20  responding to that incident gathers as much

21  information as they can and provides that

1    **information to corporate.**

2       Q.   Why is that the most important thing?

3       **A.   To ensure that once the investigation**

4    **starts beyond what we have in the store, that**

5    **they have as much information as possible.**

6       Q.   Okay.  Are you aware of anybody from

7    corporate investigated this?

8       **A.   I had no -- I personally had no**

9    **connection with anybody and I wouldn't have**

10   **connection with anybody since I was not the**

11   **manager on duty.**

12      Q.   Does a manager -- so when you're talking

13   about did the manager or acting manager at the

14   time, that would be Mr. Fox, are they required to

15   submit a handwritten report?

16      **A.   No.**

17      Q.   A signed report?

18      **A.   No.**

19      Q.   Are they required to -- what are they

20   required to prepare?

21      **A.   Again, they should take, if possible, if**

1   there is a substance on the floor, take pictures

2   of any substance, capture any video if there is

3   video, to gather as much information about the

4   plaintiff, about the incident, what happened,

5   name, phone number, at least a contact that our

6   corporation can contact them in further

7   references to it.

8       Q.   When you say plaintiff, you mean your

9   customer?

10      A.   Well, I'm talking in this incident here.

11  A customer or even an associate who may have got

12  injured, we try to gather as much information.

13      Q.   What does gathering information entail?

14      A.   Well, if it's a general liability case

15  like a customer, it would matter, try to get

16  their name and some contact information and get

17  their recollection of what happened.  So when we

18  enter it in the computer we can give as much

19  information as possible.  We're supposed to also

20  observe any areas, whether it was a trip, a fall,

21  whether it was a wet substance, we're supposed to

1   **observe that area and report that also if there**

2   **was anything like that.**

3        Q.  Do you believe that more is better, the

4   more information they get, witnesses' names,

5   information regarding who was last there, who

6   last cleaned, all that's important to help later

7   on, you know, whether it's corporate or counsel,

8   to determine what actually occurred; do you agree

9   with that?

10       **A.  I agree.**

11       Q.  Okay.  Would the report that you're

12   talking about be called a GL initial report?

13       **A.  I believe that's what it's called,**

14   **general liability incident report.**

15       Q.  I've got it.  So I'd like to show you

16   what is titled -- bear with me.  Incident report

17   and personnel files redaction.  Can you see the

18   screen?

19       **A.  I can.**

20       Q.  It says GL initial report?

21       **A.  Yes.**

Deposition of Keith Parlier                              Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    Q.  And current store manager is you?

2    **A.  Correct.**

3    Q.  Reported to Logan Fox.  He was assistant

4    manager but filling in while you were gone?

5    **A.  Correct.**

6    Q.  It occurred at 4:30 on June 18th?

7    **A.  Correct.**

8    Q.  It was reported -- it says date reported

9    by customer.  Whatever, that's the day that it

10   occurred.  And nature of incident, mats/rugs.

11   **A.  Yes.**

12   Q.  Okay.  And so it distinguishes if it was

13   a piece of fruit somebody fell on or they were

14   running or rough-housing.  This occurred because

15   the mats/rugs had a substance underneath,

16   correct?

17        MR. HUANG:  Objection to form.

18        MR. O'BRIEN:  Objection as well.

19        MR. GREENBERG:  I'm sorry?

20        MR. O'BRIEN:  Objection to form.  I

21   object as well.

Deposition of Keith Parlier                          Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    Q.   Mr. Parlier, did you understand my

2    question?

3    **A.   Based on what this incident report says,**

4    **it tells me it didn't say it was a wet substance.**

5    **It just says it was an incident based off of a**

6    **mat or rug.**

7    Q.   I apologize, a little lower down it says

8    there was water underneath the mat/rug.  Can you

9    see where my mouse is here?

10   **A.   Yes.**

11   Q.   I apologize, I was just trying to save

12   time.  But that's what somebody knew immediately

13   when this happened, correct?

14   **A.   Yes.**

15   Q.   It says under customer description of

16   incident, customer was walking by the floral

17   section in produce.  She stepped on the mat/rug

18   laying in front of the floral section and the

19   mat/rug slipped out from under her causing her to

20   fall straight; is that correct?

21   **A.   I can't see everything you were reading.**

Deposition of Keith Parlier                                   Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    But based on what I can see, that's accurate.

2              MR. GREENBERG:  Guys, can you see it?

3         A.  I can see it now.  You moved it over.

4         Q.  Okay.  Sorry.  So so far everything is

5    correct the way Food Lion wants it done,

6    correct?

7         A.  Yes.

8         Q.  All right.  Let's go to page 2.  Do you

9    see this first area?

10        A.  Yes.

11        Q.  Last associate to view the area.  What

12   is Mr. Fox's answer?

13        A.  There is no answer.

14        Q.  Is that appropriate?

15        A.  If he had knowledge of who was the last

16   person, then yes, he should enter something in

17   there.

18        Q.  Keith, your dog is barking and I've got

19   mine who just walked in.  Okay, Keith, where is

20   your dog?

21        A.  Mine is too heavy to lift up like that.

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1          MR. GREENBERG:  Hold on a second.

2          MR. HUANG:  I guess we should go off the

3    record for now.

4          (Off the record.)

5    BY MR. GREENBERG:

6      Q.  So Mr. Parlier, you would agree that he

7    did not write the last associate to view the

8    area?

9      **A.  That is correct.**

10     Q.  So you, corporate, would not be able to

11   know who was in the area but for looking at the

12   video and recognizing somebody?

13     **A.  Correct.**

14     Q.  Apparently my dog went in through the

15   other door, because he just came back in.  Time

16   area was last swept.  What is the answer?

17     **A.  No answer.**

18     Q.  You would like that as well?

19     **A.  If they had knowledge of when that was**

20   **done, yes.**

21     Q.  Sure.  And they would have knowledge

1    just by asking somebody when was the last time

2    you swept this area?

3        **A.   Correct.**

4        Q.   When was the last time you picked this

5    rug up or felt the rug to see if people had been

6    dripping water on it, correct?

7        **A.   Correct.**

8        Q.   And that's their responsibility

9    throughout the day?

10       **A.   Yes.**

11       Q.   Okay.  Were warning signs present.  That

12   does say no, correct?

13       **A.   It does, yes.**

14       Q.   And last time area was last mopped,

15   again, not mentioned?

16       **A.   Correct.**

17       Q.   You would agree that mopping would have

18   cleaned up or hopefully would have cleaned up

19   that mess?

20       **A.   If done properly, yes.**

21       Q.   Okay.  So it says was the customer

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    carrying anything.  Do you know where that came

2    from?

3        **A.   It could be were they carrying a hand**

4    **basket full of groceries.  Could be were they**

5    **carrying a diaper bag.  Just as a general**

6    **question, was something in their hands.**

7        Q.   How would they know, because the second

8    part is was the customer pushing a shopping cart,

9    and it says unknown.  Do you have any knowledge

10   as we sit here now where somebody would have come

11   up with that Ms. Rittersbacher had something in

12   her hands?

13       **A.   It just can be visual observation.**

14       Q.   Do you have any independent knowledge as

15   we're sitting here that somebody actually saw her

16   fall?

17       **A.   No.**

18       Q.   Okay.  So who would have had the visual

19   observation?

20       **A.   Just by looking at -- possibly looking**

21   **at video, or when you respond to an incident if**

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1  **the customer, you could ask them were you**

2  **carrying anything.**

3      Q.  Okay.  Don't you think, if they were

4  going down the list, don't you think they would

5  have also said were you pushing a shopping cart?

6      **A.  If it wasn't present, then yes, they**

7  **could ask if they had a shopping cart.**

8      Q.  My point is you have no idea how or why

9  this report was filled out in the manner it was,

10  correct?

11      **A.  No, I do not.**

12      Q.  It talks about the injury, the kneecap

13  was red.

14      **A.  Yes.**

15      Q.  Describe customer footwear.  There's

16  nothing written there.  Should that have been

17  noted?

18      **A.  It should have been, yes.**

19      Q.  It says was incident captured on

20  surveillance, not noted.

21      **A.  Correct.**

1     Q.   Okay.  So what you had just said a

2  second ago, maybe they watched the video, you

3  would agree with me that had they watched the

4  video, they probably would have put yes there?

5     **A.   Correct, if it was captured on video,**

6  **then yes.**

7     Q.   Here's the big one.  Were photographs

8  taken.  It says no.

9     **A.   Correct.**

10    Q.   You're aware that somebody, I believe

11  somebody from Food Lion took photographs?

12    **A.   From my understanding, yes.**

13    Q.   Okay.  And likewise, based on kind of

14  what you answered, it says if any of the above

15  surveillance questions were answered with a yes,

16  please forward the video and/or photographs.  But

17  based on this, we don't know if it was captured

18  and we -- at least it says there were no

19  pictures.  So corporate would not know that this

20  incident was captured on video, correct?

21    **A.   Correct.**

1        Q.   Additional comments and additional

2   information, you would agree there's nothing

3   written about witnesses, there's nothing written

4   about statements that my client may or may not

5   have made.  There's nothing written regarding,

6   oh, by the way, I picked up the mat and put

7   another one down.  I put out a yellow caution.

8   There's nothing written here, correct?

9        **A.   That is correct.**

10       Q.   And as a matter of fact, not only in

11  additional comments, nowhere on this typed

12  prepared form does it ask what remedial nature

13  was taken to ensure that no other customers got

14  injured or workers got injured, correct?

15       **A.   Correct.**

16       Q.   Are you familiar with OSHA?

17       **A.   Yes.**

18       Q.   And is your job to enforce OSHA at Food

19  Lion?

20       **A.   Yes.**

21       Q.   And are you aware of the training that

1  OSHA requires for safe floors to avoid injuries?

2       **A.   Yes.**

3       Q.   And do you know that OSHA states a floor

4  mat is simply a temporary floor covering designed

5  to remove dirt, moisture or other debris from

6  foot traffic entering your building; are you

7  aware of it?

8       **A.   I'm not aware that that's how it's**

9  **stated, no.**

10      Q.   Are you aware that OSHA also states that

11 indoor floor mats provide a slip resistant

12 walking surface and are the first defense in

13 preventing slips and falls for individuals

14 entering your building?

15      **A.   Again, I cannot state that's how it's**

16 **actually stated.   But I agree.**

17      Q.   Okay.   So --

18      **A.   I don't know the wording.   Sorry to talk**

19 **over you.   Sorry.   I don't know the wording.**

20           MR. GREENBERG:   Hold on one second.

21           (Off the record.)

1  BY MR. GREENBERG:

2      Q.  Do you agree that while floor mats are a

3  viable source for preventing slips and falls,

4  that the underlying issue that creates the need

5  for a floor mat must be resolved also?

6          MR. O'BRIEN:  I'm going to object.

7      **A.  Yes.**

8      Q.  And again, I don't have this computer

9  training.  I'm going to ask Jeremy to get it for

10  me.  But do you agree that training employees

11  should recognize that safety is the most

12  important thing to its customers?

13          MR. O'BRIEN:  Objection.

14      **A.  Yes.**

15      Q.  And while the company, Food Lion in this

16  case, gets vendors to come in to clean on the

17  bookends, you know, either at night or in the

18  morning, no matter what, it's still Food Lion's

19  primary obligation to its customers to keep the

20  store safe throughout the day?

21          MR. O'BRIEN:  Objection to form.

1      **A.   Yes.**

2          Q.   Let me break that down because of the

3      objection that he made.  Do you agree that Food

4      Lion has a duty to ensure that their customers

5      are safe in their store?

6      **A.   Yes.**

7          Q.   Do you agree that employees should not

8      turn their heads to danger, to dangerous

9      situations?

10     **A.   Yes.**

11         Q.   Do you have any idea when the last time

12     a vendor had been in the store before 4:30 on the

13     18th of June?

14     **A.   No, I do not.**

15         Q.   Do you believe that the material, that

16     liquid material under the mat, was caused by a

17     vendor cleaning?

18     **A.   I could only speculate where the**

19     **material came from.**

20         Q.   Okay.  Well, that's part of one of the

21     things you're here for.  Let me hear where you

Deposition of Keith Parlier                     Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1   believe it came from.

2          MR. O'BRIEN:   Objection.

3      **A.   It could come from a couple different**

4   **sources.   It could come from floor service with**

5   **the floor mat, pulling up the floor mat, running**

6   **over it and then putting the mat back over top of**

7   **a wet floor.   That would create the slipperiness**

8   **underneath the rug.   It could come from the**

9   **assumption that the unit had a leak and water**

10  **flowed underneath of it.   So that's just a couple**

11  **assumptions that could have happened.**

12     Q.   The reason I showed you that picture, I

13  think it was number 4, a unit similar to the same

14  one, or you say it's not the same one, but we

15  were advised it was.   But regardless, is that

16  those units do leak sometimes, correct?

17     **A.   On occasion.**

18     Q.   And that when they leak, usually -- I

19  mean, you shouldn't do what number 4 did and

20  that's just take rags or towels and put them up.

21  But you should actually fix that leak, correct?

Deposition of Keith Parlier                     Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    A.   If you can fix it in the moment, then

2    yes.   On occasion it's a plumbing issue or a pipe

3    issue that you cannot fix in the store.   So you

4    have to provide the safest area that you can

5    until maintenance can perform their duties.

6         Q.   And the safest area would be what,

7    putting down mats?

8         A.   It depends on the size of the leak.   It

9    could be keeping towels there like they did in

10   that one picture just to help soak up the floor

11   and keep it from flowing out.   It could be

12   putting down a mat if you have an extra mat to be

13   provided.   And also make sure you have wet floor

14   signs around that to let customers know there is

15   an unsafe condition.

16        Q.   Okay.   Do you recall any e-mails between

17   you and Mr. Fox regarding this incident when you

18   were gone?

19        A.   No, I do not.

20        Q.   Do you remember any e-mails between you

21   and anyone after you got back regarding this

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

 1   incident?

 2        A.  No, I do not.

 3        Q.  Do you have any independent recollection

 4   before June 18 of 2019 if that unit was leaking?

 5        A.  No, I do not.

 6        Q.  But you can't deny it, correct?  If it

 7   did, you just don't know or remember?

 8        A.  Like I said, I don't know if it was

 9   leaking or not.

10        Q.  Okay.  And likewise, do you know whose

11   decision it was to put the mat in that area

12   directly in front of where the motor unit is?

13        A.  Again, the mats are placed strategically

14   throughout the produce department based on water,

15   possibility of water leakage from product being

16   handled.

17        Q.  Are you aware that Vane, who you don't

18   know who they are, but Vane is a cleaning

19   service, that they claim that somebody from Vane

20   spoke with a maintenance worker or somebody at

21   Food Lion and told them that the unit was

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    leaking?

2         **A.   I am not aware of that, no.**

3         Q.   Again, one of the things in the

4    corporate designee notice was specifically any

5    warnings that were given prior to this incident,

6    but you don't have any knowledge of that.

7         **A.   No, I do not.**

8         Q.   Did you review Vane's Answers to

9    Interrogatories?

10        **A.   No, I have not.**

11        Q.   One of the things in the corporate

12   designee notice was specifically relating to

13   Answers to Interrogatories, and you don't have

14   any knowledge?

15        **A.   No.**

16        Q.   Do you know who would have knowledge

17   from Food Lion regarding Vane's claim that they

18   let Food Lion know that that unit was leaking?

19        **A.   No, I do not.**

20             MR. GREENBERG:  I have nothing further.

21             MR. HUANG:  Mr. Parlier, I just have one

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    quick question.

2              EXAMINATION BY MR. HUANG:

3         Q.   You mentioned that the floor mats put

4    down strategically.  Could you give more detail

5    about that?

6         **A.   We know as an organization that there's**

7    **certain areas inside of the store that there is**

8    **the probability of water buildup on a floor.  So**

9    **we strategically place our mats in front of**

10   **floral units.  We strategically put some in front**

11   **of what we call our wet wall or wet vegetables**

12   **which are sprayed or get wet throughout the day**

13   **where customers pick them up, and we also place**

14   **mats in front of the ice chest due to a possible**

15   **broken ice bag or something similar to that.**

16        Q.   So these mats are put down at all Food

17   Lion stores in front of the same places you just

18   mentioned?

19        **A.   Correct.**

20        Q.   I just recalled another question.  So

21   earlier Larry had asked you about the

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1    surveillance cameras and where they are located

2    in the store, correct?

3        **A.   Yes.**

4        Q.   What is the purpose of those cameras?

5        **A.   Please reask the question, please.**

6        Q.   What is the purpose of the surveillance

7    cameras in the store?

8        **A.   Surveillance cameras are there to**

9    **protect the customer and the assets of the store**

10   **and to provide any information that it can**

11   **provide.  None of the stores have complete**

12   **coverage.  But they are strategically placed to**

13   **provide safety to our associates and to our**

14   **customers and to protect our assets.**

15           MR. HUANG:  That's all I have.

16           MR. O'BRIEN:  I don't have any

17   questions.

18           MR. GREENBERG:  I have one more.

19           EXAMINATION BY MR. GREENBERG:

20       Q.  Mr. Parlier, you just finished, your

21   last statement was protect your assets.  What do

1  you mean by that?

2      **A.   Well, some cameras are placed at the**

3  **register to ensure that we don't have internal**

4  **theft or to ensure that we don't have an external**

5  **say flim-flam money switch type incidents inside**

6  **our registers.**

7      Q.   I thought you meant to prevent lawsuits

8  because you had mentioned plaintiff before.

9  You're not talking about that?

10     **A.   No, no.**

11     Q.   One last thing.  Jeremy had mentioned

12  specifically regarding strategic placement.  I

13  want to show you a video.  Can you see the

14  screen?

15     **A.   I can.**

16     Q.   Other than, I will tell you and/or you

17  would know, that this floral arrangement is right

18  up here on the top right?

19     **A.   Okay.**

20     Q.   Clearly you can see the mat right there?

21     **A.   Yes.**

1    Q.  In all these other areas where there's

2    produce, there is not one mat on the ground,

3    would you agree with that?

4    **A.  Not in this video, no.**

5    Q.  Okay.  Where else -- and this is the

6    produce area.  Where else would mats be?

7    **A.  So not where you can see.  To the right**

8    **of the video there should be a section with wet**

9    **vegetables on it.  So your wet lettuces, cabbages**

10   **and things like that that get sprayed with water.**

11   **So they would be placed in front of that section**

12   **also.**

13   Q.  I got it.  So you place them, as Jeremy

14   mentioned, you place them in areas where you know

15   there is going to be a buildup of water over the

16   day?

17   **A.  Correct.**

18   MR. GREENBERG:  Thank you.  I have

19   nothing further.

20   MR. O'BRIEN:  No questions for me.

21   MR. GREENBERG:  Jeremy, do you want to

1   advise him?

2          MR. HUANG:  Mr. Parlier, you're going to

3   have the opportunity to read and sign the

4   deposition transcript to review for errors in

5   anything, any misspellings, misunderstandings,

6   things like that, so we would advise you to do

7   that.  But it's certainly your choice to do so.

8          THE WITNESS:  Okay.

9          THE REPORTER:  What would everyone like?

10          MR. GREENBERG:  Mini is fine.

11          MR. O'BRIEN:  Mini electronic.

12          MR. HUANG:  Mini.  That's what I meant.

13          (Off the record.)

14          (Whereupon, the deposition was concluded

15   at 2:30 p.m.)

16                    *        *        *

17

18

19

20

21

Deposition of Keith Parlier                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

```
 1                    CERTIFICATE OF DEPONENT

 2


 3        I hereby certify that I have read and

 4   examined the within transcript, and the same is a

 5   true and accurate record of the testimony given

 6   by me.

 7        Any additions or corrections that I feel are

 8   necessary, I will write on a separate sheet of

 9   paper to the original transcript.

10

11

12

13

14        _____

15                    KEITH PARLIER

16

17        _____

18                    DATE

19

20

21
```

Deposition of Keith Parlier                          Jasmine Rittersbacher vs. Food Lion, LLC, et al.

1  STATE OF MARYLAND
   COUNTY OF BALTIMORE
2

3           I, Linda A. Crockett, a Notary Public of
   the State of Maryland, do hereby certify that the
4  within named, KEITH PARLIER, was deposed at the
   time and place herein set out, and after having
5  been duly sworn by me, was interrogated by
   counsel.
6
            I further certify that the examination
7  was recorded stenographically by me, and this
   transcript is a true record of the proceedings.
8
            I further certify that the stipulations
9  made herein were entered into by counsel in my
   presence.
10
            I further certify that I am not of
11 counsel to any of the parties, nor an employee of
   counsel, nor related to any of the parties, nor
12 in any way interested in the outcome of this
   action.
13
            As witness my hand and notarial seal
14 this 25th day of January, 2022.

15 My commission expires:  December 28, 2024

16
                    _Linda A Crockett_
17 _____
                    Notary Public
18

19

20

21

Deposition of Keith Parlier                          Jasmine Rittersbacher vs. Food Lion, LLC, et al.

```
 1                    INDEX OF WITNESSES

 2    WITNESS                                    PAGE

 3    KEITH PARLIER

 4      EXAMINATION BY MR. GREENBERG              4

 5      EXAMINATION BY MR. HUANG                  79

 6      EXAMINATION BY MR. GREENBERG              80

 7

 8

 9

10                  E X H I B I T S

11              (No exhibits were marked.)

12

13

14

15

16

17

18

19

20

21
```

Deposition of Keith Parlier                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

## WORD INDEX

**< 1 >**
**1**  25:*18*
**1:00**  1:*14*
**12-31-1970**  5:*13*
**1600**  3:*5*
**18**  77:*4*
**18th**  63:*6*
74:*13*

**< 2 >**
**2**  35:5  38:*17*
41:*17*  44:9
65:*8*
**2:30**  83:*15*
**20**  5:*18*  18:*20*
19:*5*
**2018**  13:*17*, 20
16:*4*
**2019**  4:*21*
13:*21*  22:*19*
34:9  52:*1*  77:*4*
**2022**  1:*13*
85:*14*
**2024**  85:*15*
**20-plus**  56:*5*
**21**  1:*13*
**21202**  2:*6*, *14*
3:*6*
**2201**  1:*14*
**25th**  85:*14*
**28**  85:*15*

**< 3 >**
**3**  33:*19*  38:*16*

**< 4 >**
**4**  40:*16*  45:*21*
48:*12*  52:*14*
75:*13*, 19  86:*4*
**4:30**  63:*6*
74:*12*
**40**  56:*5*
**410**  2:*7*, *15*  3:*7*
**415-1666**  2:*15*

**< 5 >**
**5**  58:*11*

**50**  18:*13*  50:*3*
**539-5250**  2:*7*

**< 6 >**
**6**  2:*5*

**< 7 >**
**7**  3:*5*
**711**  2:*13*
**752-1630**  3:*7*
**79**  86:*5*

**< 8 >**
**80**  86:*6*

**< A >**
**able**  16:*17*
66:*10*
**acceptable**
29:*10*
**accountability**
31:*1*
**accurate**  26:*17*
29:*15*  65:*1*
84:*5*
**Act**  29:*12*  30:*6*,
15
**acting**  60:*13*
**ACTION**  1:*7*
58:*8*  85:*12*
**activities**  16:*6*
**actual**  8:*12*
15:*4*  30:*2*
37:*14*  38:*17*
39:*21*
**add**  45:5  46:*19*
**addition**  10:*3*
**Additional**  71:*1*,
*11*
**additions**  84:*7*
**advise**  83:*1*, 6
**advised**  75:*15*
**afternoon**  4:*14*
58:*11*
**ago**  20:*18*  42:*3*
55:*16*  56:5, 6
59:*11*  70:*2*
**agree**  12:*16*
28:5, *13*  29:*16*
38:*21*  39:*2*

**42**:*11*  43:*12*
45:*4*, 10  46:*19*
47:*13*, *18*  48:*6*
50:*7*  51:*12*
62:*8*, 10  66:*6*
67:*17*  70:*3*
71:*2*  72:*16*
73:*2*, 10  74:*3*, 7
82:*3*
**agreed**  4:*4*
**ahead**  17:*10*
**al**  1:*7*
**Allen**  5:*11*
**amended**  26:*15*
**amendment**
10:*8*  18:*2*
**and/or**  70:*16*
81:*16*
**Anderson**  3:*4*
**answer**  7:*8*, *19*
8:*6*, *21*  12:*10*
20:*21*  21:*5*
39:*8*, 9  50:*11*
65:*12*, *13*  66:*16*,
*17*
**answered**  70:*14*,
*15*
**answering**  7:*21*
16:*10*  17:*15*
**Answers**  78:*8*,
*13*
**anybody**  31:*17*
60:*6*, 9, *10*
**apologize**  64:*7*,
*11*
**Apparently**
66:*14*
**appeal**  29:*10*
**APPEARANCE
S**  2:*1*  3:*1*
**appears**  40:*19*
41:*6*  42:*10*
56:*7*
**appointed**  26:*4*
**appropriate**
8:*6*  31:*20*  32:5,
19  43:*1*, 5, *15*
56:*15*, *17*, *19*, *20*
65:*14*

**appropriately**
57:*20*
**Approximately**
14:*4*
**area**  15:*6*, *15*
16:*7*  30:*6*, *14*
31:*15*, *16*, 20
32:*7*, *11*, *19*
33:*4*, 7, *11*  35:*2*
36:*10*  38:*1*, 20
41:*14*, *17*  44:9
58:*13*  62:*17*
65:9, *11*  66:*8*,
*11*, 16  67:*2*, *14*
76:*4*, 6  77:*11*
82:*6*
**areas**  22:*21*
43:*17*, 21  49:*18*
61:*20*  79:*7*
82:*1*, *14*
**arm**  56:*9*
**arrangement**
81:*17*
**arrested**  18:*9*,
*11*
**asked**  17:*12*
27:*1*  51:*6*
55:*10*, *11*  59:*4*,
9  79:*21*
**asking**  48:*5*
56:*18*  67:*1*
**assets**  80:9, *14*,
21
**assist**  16:*9*
17:*15*
**assistance**  33:*3*
**assistant**  13:*3*,
8  23:*4*  32:*5*
63:*3*
**associate**  23:*5*
28:*17*  31:*2*
54:*8*, *11*  58:*2*, 6
59:*19*  61:*11*
65:*11*  66:*7*
**associates**
22:*11*, 20  51:*2*
58:*4*  80:*13*
**associate's**  23:*3*
**assume**  37:*5*

**assumption**
25:*7*, 9  44:*16*
75:*9*
**assumptions**
75:*11*
**assurance**
49:*14*  51:*3*
55:*5*
**assure**  32:*15*
51:*18*  57:*3*, 5
**attendance**
29:*12*
**attorney**  9:*16*,
*17*  32:*2*
**avoid**  72:*1*
**aware**  14:*5*, *16*
15:*5*, *8*  16:*3*
24:*5*, *11*, *15*
25:*2*, 5  26:*2*
27:*16*  37:*19*
38:9  41:*12*
44:*2*  49:*2*  52:*8*
60:*6*  70:*10*
71:*21*  72:*7*, *8*,
10  77:*17*  78:*2*

**< B >**
**back**  8:*10*  19:*4*
22:*5*  25:*11*
31:*5*  32:*17*
34:9  35:*8*
37:*21*  38:*15*
46:*3*  55:*2*, 6, *19*
56:*4*, *12*, 21
57:*14*  66:*15*
75:*6*  76:*21*
**bag**  68:*5*  79:*15*
**Baltimore**  1:*15*
2:*6*, *14*  3:*6*
85:*1*
**banana**  50:*1*
**barking**  65:*18*
**Based**  12:*19*
13:*2*  18:*2*
19:*19*  24:*15*
25:*5*, 6  27:*11*,
*14*  31:*21*  32:*1*
33:*8*  34:9
36:*16*  52:*20*
56:*7*, *16*  57:*10*

Deposition of Keith Parlier

Jasmine Rittersbacher vs. Food Lion, LLC, et al.

64:*3, 5*  65:*1*
70:*13, 17*  77:*14*
basket  68:*4*
bathroom  49:*18*
bathrooms  49:*7*
Bear  6:*20*
16:*15*  18:*6*
34:*8*  43:*11*
62:*16*
beginning  57:*9*
behalf  2:*8, 16*
3:*8*  5:*21*  6:*2*
16:*18*  17:*2*
behavior  29:*11*
believe  10:*7*
12:*7*  13:*17*
23:*15*  32:*3*
45:*15*  46:*7*
55:*17*  62:*3, 13*
70:*10*  74:*15*
75:*1*
bending  53:*15*
beneath  42:*8*
beneficial  50:*17*
benefit  44:*1*
Bergensons
2:*18*  16:*21*
21:*13, 15, 19, 21*
22:*2*  39:*19, 20*
40:*3*  48:*20*
better  53:*20*
58:*3*  62:*3*
beyond  60:*4*
Biddle  2:*5*
big  70:*7*
birth  5:*12*
bit  18:*1*
bookends  50:*19*
73:*17*
boring  57:*3*
Bottom  6:*3, 5*
bouquet  36:*7,
18*
bouquets  34:*15,
20, 21*  35:*1*
36:*8, 11*
boxes  6:*11, 13*
break  8:*17, 19*
9:*1*  19:*2*  45:*10,*

*16*  74:*2*
briefly  17:*18*
bring  21:*2*
broke  16:*1*
broken  79:*15*
bucket  35:*1*
buckets  34:*16*
36:*9*
buffing  39:*13*
building  12:*5*
72:*6, 14*
buildup  79:*8*
82:*15*
built  12:*9*
bunch  28:*10*
42:*9*
business  16:*5*
20:*10*
button  6:*19*

< C >
cabbages  82:*9*
call  7:*17*  11:*1,
4*  12:*12, 14*
15:*6*  20:*11*
21:*21*  22:*1*
28:*16*  29:*20*
49:*13*  79:*11*
called  5:*3*  10:*7*
24:*13*  33:*18*
40:*8*  51:*2*
62:*12, 13*
camera  15:*5, 9,
12, 18*  16:*4*
47:*5*
cameras  15:*16*
80:*1, 4, 7, 8*
81:*2*
capture  61:*2*
captured  69:*19*
70:*5, 17, 20*
carpet  11:*4*
carrying  68:*1,
3, 5*  69:*2*
cart  38:*11*
44:*4*  68:*8*  69:*5,
7*
case  11:*9, 11,
12, 20*  16:*10*

17:*16*  61:*14*
73:*16*
C-A-S-E  11:*11*
cause  46:*16*
caused  24:*19*
25:*3*  74:*16*
causes  30:*7*
causing  64:*19*
caution  71:*7*
certain  43:*17,
21*  49:*18*  79:*7*
certainly  83:*7*
CERTIFICATE
84:*1*
certify  84:*3*
85:*3, 5, 7, 9*
change  52:*5*
changed  42:*2*
52:*2, 9*
charge  22:*20*
24:*2*
chart  49:*8*
check  17:*4, 6*
49:*21*
checklist  51:*8,
21*
checklists
50:*14*  51:*6, 7*
chest  79:*14*
choice  83:*7*
CIVIL  1:*7*
claim  77:*19*
78:*17*
clarify  21:*18*
clean  22:*21*
43:*2, 6*  46:*20*
47:*16*  52:*6*
73:*16*
cleaned  48:*13,
15*  49:*4*  52:*11*
58:*14*  62:*6*
67:*18*
Cleaning  3:*9*
39:*12*  40:*9*
49:*13*  50:*5*
51:*4*  53:*2*
56:*21*  74:*17*
77:*18*
cleans  49:*10*

50:*20*
clear  8:*5*
clearly  44:*9*
81:*20*
client  12:*21*
53:*9*  71:*4*
clock  29:*2*
39:*16, 17*
coach  58:*2, 4*
coaching  54:*10*
Coe  3:*4*
college  18:*8*
colloquialisms
8:*4*
come  8:*10*
31:*4, 13*  36:*17*
38:*10*  40:*4*
49:*20*  51:*13*
68:*10*  73:*16*
75:*3, 4, 8*
comes  8:*7*
30:*10*  39:*12*
48:*17*  49:*10*
50:*20*  51:*9*
52:*4*
coming  44:*5*
comments  71:*1,
11*
commission
85:*15*
common  48:*5*
communications
22:*5*
companies  6:*1*
21:*2*
company  16:*19*
28:*10*  39:*12*
44:*17, 20*  52:*3*
53:*2*  73:*15*
Complaint  10:*9,
10*  12:*19*  26:*15*
complete  80:*11*
computer  30:*2*
59:*7*  61:*18*
73:*8*
computer-based
28:*17*  30:*3*
computer-
generated  54:*2*
concluded  83:*14*

condition  30:*14*
31:*4*  33:*5*
54:*10*  58:*7*
76:*15*
conditions
54:*12*  58:*3, 5*
conduct  32:*5,
20*
cone  56:*13*
confusing  21:*20*
connection
60:*9, 10*
constantly  58:*4*
constructed
12:*9*
construction
12:*5*
consumers  45:*6*
contact  61:*5, 6,
16*
contacted  24:*7,
9*
context  5:*21*
continue  31:*6*
38:*6*
CONTINUED
3:*1*
continues  38:*12*
contract  21:*17*
39:*19*  40:*2*
contracting
12:*4*
conversations
10:*1, 3*
convicted  18:*14*
convictions
18:*16*
cordon  31:*16*
CORPORATE
1:*11*  5:*4*  6:*7*
12:*4*  26:*5*
28:*14*  39:*17*
55:*10*  60:*1, 7*
62:*7*  66:*10*
70:*19*  78:*4, 11*
corporation
61:*6*
correct  6:*11, 12*
11:*13*  16:*8*
21:*9*  23:*9*  27:*4*

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 2

Case 1:20-cv-02800-JMC   Document 63-8   Filed 04/28/22   Page 89 of 97

Deposition of Keith Parlier                                     Jasmine Rittersbacher vs. Food Lion, LLC, et al.

28:*11*  31:*8*
35:*17*  37:*6*
38:*8, 19*  39:*13*
43:*13*  44:*6, 7,*
*14*  46:*12*  48:*21*
49:*1*  51:*15*
63:*2, 5, 7, 16*
64:*13, 20*  65:*5,*
*6*  66:*9, 13*  67:*3,*
*6, 7, 12, 16*
69:*10, 21*  70:*5,*
*9, 20, 21*  71:*8, 9,*
*14, 15*  75:*16, 21*
77:*6*  79:*19*
80:*2*  82:*17*
**corrections**  84:*7*
**correctly**  21:*9*
23:*16*  50:*15*
55:*15*
**counsel**  4:*5*
7:*9*  57:*6*  62:*7*
85:*5, 9, 11*
**counseling**
29:*11*
**COUNTY**  85:*1*
**couple**  20:*18*
55:*16*  75:*3, 10*
**course**  15:*19*
16:*5*
**COURT**  1:*1,*
*14*  6:*14*  32:*15*
**coverage**  80:*12*
**covered**  30:*1*
**covering**  72:*4*
**CRC**  1:*14*
**create**  75:*7*
**created**  53:*2*
58:*7*
**creates**  73:*4*
**crew**  21:*8, 14,*
*16*  48:*16*  51:*9*
**Crockett**  1:*15,*
*21*  6:*13, 14*
85:*3*
**current**  22:*11*
63:*1*
**currently**  9:*3*
22:*7*
**customer**  34:*21*
36:*11*  37:*17*

59:*3, 5, 18*  61:*9,*
*11, 15*  63:*9*
64:*15, 16*  67:*21*
68:*8*  69:*1, 15*
80:*9*
**customers**
29:*18*  36:*17*
38:*10*  51:*13, 18*
54:*13*  71:*13*
73:*12, 19*  74:*4*
76:*14*  79:*13*
80:*14*
**cut**  36:*7, 8*

**< D >**
**danger**  43:*2*
74:*8*
**dangerous**  32:*6*
46:*8*  74:*8*
**date**  5:*12*
54:*14*  63:*8*
84:*18*
**day**  15:*10*
28:*18*  30:*2*
33:*2*  45:*20*
48:*16*  51:*8, 13*
54:*21*  55:*20*
58:*17*  63:*9*
67:*9*  73:*20*
79:*12*  82:*16*
85:*14*
**debris**  72:*5*
**December**  85:*15*
**decision**  77:*11*
**DEFENDANT**
1:*12*  2:*16*  3:*8*
**Defendants**  1:*8*
**defense**  72:*12*
**deny**  77:*6*
**department**
15:*7, 8, 9, 14, 21*
16:*7*  19:*14*
20:*5*  23:*2, 7, 8,*
*11, 12*  24:*4*
27:*9*  41:*19, 21*
43:*18*  77:*14*
**dependent**  32:*9*
**depending**  23:*1*
**depends**  76:*8*

**DEPONENT**
84:*1*
**deposed**  5:*14,*
*17, 21*  6:*21*
85:*4*
**Deposition**  1:*11*
4:*6*  5:*3*  9:*21*
12:*11*  14:*6*
15:*2*  18:*21*
19:*9, 20*  25:*15*
58:*20*  83:*4, 14*
**depositions**
19:*5*  20:*7*
**describe**  41:*8*
69:*15*
**description**
64:*15*
**designated**
21:*11*
**designation**
40:*7*
**designed**  72:*4*
**DESIGNEE**
1:*12*  5:*5*  6:*7*
26:*5*  78:*4, 12*
**detail**  50:*16*
79:*4*
**determine**  62:*8*
**diaper**  68:*5*
**different**  75:*3*
**directly**  12:*17*
15:*13*  38:*18*
77:*12*
**dirt**  72:*5*
**discharging**
18:*12*
**disciplinary**
57:*18*  58:*8*
**discovery**  16:*10*
17:*15*
**discrimination**
29:*6*
**discuss**  25:*18*
26:*12*
**discussion**  32:*1*
**display**  23:*9*
**distinguish**
31:*19*
**distinguishes**
63:*12*

**DISTRICT**  1:*1,*
*2*
**document**
16:*15*  52:*7*
**documents**
10:*4*  11:*19*
12:*2*  16:*12*
25:*20*  26:*1*
50:*4*
**dog**  65:*18, 20*
66:*14*
**doing**  48:*19, 20*
**Dollar**  6:*3, 6*
**door**  29:*9*  49:*8*
66:*15*
**drip**  35:*2*
36:*20*  38:*6, 12*
**dripping**  67:*6*
**drips**  37:*14*
**drop**  36:*12*
51:*14*
**dry**  36:*6*
**Due**  26:*7*  79:*14*
**duly**  4:*10*  85:*5*
**duties**  22:*9*
76:*5*
**duty**  55:*20*
60:*11*  74:*4*

**< E >**
**earlier**  79:*21*
**easier**  41:*4*
**East**  2:*5*
**edges**  46:*12*
**either**  27:*3*
44:*3*  73:*17*
**elected**  37:*3*
**electronic**  83:*11*
**ELH-20-2800**
1:*8*
**e-mails**  76:*16,*
*20*
**emotional**  9:*7*
**employed**  56:*11*
**employee**  23:*19*
28:*15*  32:*6, 20*
54:*4*  85:*11*
**Employees**
39:*6*  44:*11, 21*

49:*21*  57:*19*
73:*10*  74:*7*
**EMTs**  31:*13*
**enforce**  71:*18*
**ensure**  60:*3*
71:*13*  74:*4*
81:*3, 4*
**entail**  61:*13*
**enter**  43:*10*
61:*18*  65:*16*
**entered**  10:*15*
13:*6*  59:*6*  85:*9*
**entering**  72:*6,*
*14*
**entitled**  5:*4*
**equal**  29:*11*
**errors**  83:*4*
**ESQUIRE**  2:*3,*
*11*  3:*3*
**establishments**
49:*8*
**et**  1:*7*
**evening**  49:*16*
50:*21*  51:*5*
**everybody**
50:*15*
**everyone's**  39:*1,*
*3, 10*
**exact**  33:*6*
42:*12*  58:*10*
**exactly**  34:*5*
**EXAMINATIO**
**N**  4:*13*  79:*2*
80:*19*  85:*5*
86:*4, 5, 6*
**examined**  84:*4*
**examples**  47:*7*
**exception**  8:*20*
**exhibit**  33:*18*
38:*16*  45:*21*
48:*12*
**exhibits**  86:*11*
**exists**  46:*6*
**experience**
36:*17*  38:*9*
**expert**  21:*11*
40:*7*
**expires**  85:*15*
**explain**  7:*11*

Deposition of Keith Parlier                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

24:7  35:19
external  81:4
extra  76:12
extremely  57:3

< F >
fact  24:17
25:6  26:7
71:10
facts  17:19
fair  7:3, 4, 21
fall  61:20
64:20  68:16
falling  14:18
20:1
falls  72:13  73:3
familiar  28:1
71:16
Family  29:12
far  6:16  7:5
18:7  65:4
fast  37:17
feature  57:19
feel  84:7
feet  18:13
31:19
fell  4:20  20:4
24:6, 20  25:4, 5
33:2  48:14
58:21  63:13
felt  58:6  67:5
filed  5:4  55:11
files  18:3  62:17
filled  35:1
36:9  69:9
filling  63:4
find  55:13
fine  57:12
83:10
finished  80:20
firearm  18:12
first  4:10  5:16
8:21  13:19
28:18  30:1
59:13  65:9
72:12
five  6:11
fix  30:15  31:5
32:9  43:8

59:10  75:21
76:1, 3
fixing  20:19
flat  32:17
flim-flam  81:5
floor  21:8, 14,
16, 17  32:11
33:10, 11, 12, 18,
21  35:5, 20
36:13  37:5, 8,
15  38:16  40:21
41:1, 5, 7, 10
42:6, 8, 19  43:3,
8  45:12, 21
46:4, 20, 21
47:21  48:7, 12,
16, 17, 19  50:2
51:9, 10  53:10
61:1  72:3, 4, 11
73:2, 5  75:4, 5,
7  76:10, 13
79:3, 8
floors  72:1
floral  11:9, 10
12:12, 13  19:15
23:9  27:9
34:21  36:9, 10
40:19  64:16, 18
79:10  81:17
flowed  75:10
flowers  27:10
38:5  42:13
50:3
flowing  76:11
followed  50:14
55:8  59:4
follows  4:12
49:15
follow-up  31:2
FOOD  1:7, 12
2:17  4:20  5:5
6:1, 6  9:18
10:1  11:17
12:8  16:6
18:19  20:10, 12,
17  21:4, 7  22:6
23:19  26:5
28:5  29:9
44:18  49:2
51:3  56:11

65:5  70:11
71:18  73:15, 18
74:3  77:21
78:17, 18  79:16
Foods  6:3, 6
foot  72:6
footwear  69:15
form  24:21
48:1, 2  49:3, 6
50:10  63:17, 20
71:12  73:21
forward  8:15
70:16
found  55:18
fourth  25:20
Fox  13:11, 12,
13, 15  14:10, 13
31:14  32:16
54:21  55:7
57:15  58:16
60:14  63:3
76:17
Fox's  14:5
65:12
fresh  38:18
Friday  1:13
front  11:3, 9
12:18  34:10, 15,
20  40:18  43:21
64:18  77:12
79:9, 10, 14, 17
82:11
fruit  63:13
full  5:10  21:14
68:4
further  46:18
61:6  78:20
82:19  85:5, 7, 9

< G >
gained  14:19
gather  61:3, 12
gathering  61:13
gathers  59:20
general  15:20
41:14  45:5, 17
46:11, 15  61:14
62:14  68:5
gentleman  56:8,

9
gestures  8:3
getting  47:21
58:19
gift  29:9
give  7:8  53:21
61:18  79:4
given  19:9, 20
78:5  84:5
GL  62:12, 20
go  7:1, 3, 11
8:15  13:5  16:6
17:8, 10  18:6, 7
19:4  28:10, 17
29:8  31:12
32:10  35:8
37:4, 7, 14
38:15  46:3, 18
49:21  55:2, 6
65:8  66:2
goes  15:19
44:3
going  26:11
29:8  31:10
47:1  51:19
69:4  73:6, 9
82:15  83:2
Good  4:14  8:8,
14  57:10  59:9
gotten  27:2
33:3
grabs  44:2, 3
gratuities  29:9
GREENBERG
2:3, 4  4:13, 18
7:16  17:1, 7, 11,
13  63:19  65:2
66:1, 5  72:20
73:1  78:20
80:18, 19  82:18,
21  83:10  86:4,
6
groceries  68:4
ground  7:1
32:18  44:10
82:2
guess  5:9  19:2
66:2
guy  53:15

Guys  65:2

< H >
half  42:3  49:9
59:11
hand  8:3
38:12  68:3
85:12
handle  57:20
58:4
handled  77:16
hands  44:4
68:6, 12
handwritten
60:15
happen  30:21
38:14  46:14
47:17  51:20
57:2
happened
24:10  50:10
55:3  61:4, 17
64:13  75:11
Harassment
29:6
hazard  45:5
46:20  47:9, 11,
13
heads  74:8
hear  6:15  7:15
8:16  74:21
heard  40:9
heavy  65:21
help  16:17
17:19  20:14
62:6  76:10
helps  20:12
hire  39:11, 21
40:4
hired  28:9
hiring  21:2
29:21  48:20
history  37:11
41:11
Hold  16:15
43:11  46:1
66:1  72:20
Holy  5:19
honesty  28:21

Deposition of Keith Parlier                                   Jasmine Rittersbacher vs. Food Lion, LLC, et al.

Hopefully  6:*11*
7:*8*  37:*4, 8*
67:*18*
hour  49:*9*
hourly  49:*9*
housed  42:*13*
housekeeper
49:*15*
HUANG  2:*11*
10:*2*  14:*20*
16:*20*  17:*4, 10*
18:*3*  24:*21*
39:*4*  45:*8*  48:*2,*
*9*  50:*10*  52:*19*
63:*17*  66:*2*
78:*21*  79:*2*
80:*15*  83:*2, 12*
86:*5*
huh-uh  8:*4*
hurt  13:*1*
15:*10*  42:*14*
54:*15*

< I >
ice  79:*14, 15*
idea  14:*13*
48:*11*  58:*9*
69:*8*  74:*11*
ignore  47:*2*
imagine  12:*3*
immediate
24:*16*
immediately
64:*12*
important
26:*11*  60:*2*
62:*6*  73:*12*
inability  52:*6*
incident  4:*19*
12:*21*  13:*20*
23:*13*  24:*16*
33:*8*  55:*12, 14,*
*18*  58:*17*  59:*3,*
*6, 17, 18, 19, 20*
61:*4, 10*  62:*14,*
*16*  63:*10*  64:*3,*
*5, 16*  68:*21*
69:*19*  70:*20*
76:*17*  77:*1*
78:*5*

incidents  37:*16*
81:*5*
included  23:*8*
including  30:*8*
increments  49:*9*
independent
12:*20*  68:*14*
77:*3*
INDEX  86:*1*
individual  27:*8*
28:*14*
individuals
72:*13*
indoor  72:*11*
information
18:*1*  33:*9*  52:*8*
53:*6, 9, 12*  55:*9*
59:*21*  60:*1, 5*
61:*3, 12, 13, 16,*
*19*  62:*4, 5*  71:*2*
80:*10*
initial  62:*12, 20*
24:*6*  27:*19*
45:*21*  61:*12*
71:*14*
injuries  50:*8*
72:*1*
injury  19:*6*
69:*12*
inside  10:*15*
15:*16*  20:*13*
21:*18*  22:*17*
51:*5*  59:*17*
79:*7*  81:*5*
inspect  43:*8*
instance  33:*7*
instances  40:*3*
intentionally
29:*17*
interested  85:*12*
internal  81:*3*
interrogated
85:*5*
interrogatories
16:*11*  25:*19*
78:*9, 13*
introduced
13:*18*

investigated
60:*7*
investigation
60:*3*
involves  28:*20*
issue  26:*10*
58:*5*  73:*4*  76:*2,*
*3*
issues  26:*6*
item  36:*12*
items  36:*3*
its  73:*12, 19*

< J >
JAMES  3:*3*
January  1:*13*
85:*14*
JASMINE  1:*4*
4:*19*
JEREMY  2:*11*
16:*17*  17:*2, 7*
47:*4*  50:*12*
73:*9*  81:*11*
82:*13, 21*
Jeremy's  57:*10*
job  39:*1, 3*
54:*18*  71:*18*
June  4:*20*  52:*2*
63:*6*  74:*13*
77:*4*

< K >
Karlene  23:*14,*
*18*
K-A-R-L-E-N-E
23:*14*
KBS  22:*1*
keep  12:*13*
28:*6*  38:*4*  54:*5*
73:*19*  76:*11*
keeping  76:*9*
KEITH  1:*12*
4:*9*  5:*11*  65:*18,*
*19*  84:*15*  85:*4*
86:*3*
Kellermeyer
2:*18*  9:*18*
16:*20*  21:*7, 8,*
*13, 15, 20*

kept  47:*16*
Kiernan  2:*12*
kind  10:*19*
52:*5, 6*  70:*13*
King  3:*4*
knee  24:*20*
kneecap  69:*12*
knew  24:*8*
58:*20*  64:*12*
know  7:*2*  8:*8,*
*15, 19*  10:*19*
11:*5, 15*  12:*2*
13:*13*  15:*15*
21:*3*  23:*7, 11,*
*21*  24:*12, 14*
25:*6, 21*  26:*4,*
*14, 16*  28:*12, 13*
34:*12*  36:*16*
39:*11, 15, 17*
40:*3*  42:*18*
47:*20*  48:*18, 20*
49:*7*  52:*1*  53:*1,*
*18, 21*  56:*13*
57:*8*  58:*10, 13*
62:*7*  66:*11*
68:*1, 7*  70:*17,*
*19*  72:*3, 18, 19*
73:*17*  76:*14*
77:*7, 8, 10, 18*
78:*16, 18*  79:*6*
81:*17*  82:*14*
knowingly  58:*6*
knowledge
12:*20*  13:*2*
14:*19*  26:*6, 13*
27:*7*  34:*9*
65:*15*  66:*19, 21*
68:*9, 14*  78:*6,*
*14, 16*
knowledgeable
14:*7*
known  13:*15*

< L >
laid  56:*12*
Larry  4:*18*
7:*16*  79:*21*
Law  2:*4*
LAWRENCE

2:*3*  4:*17*
lawsuits  81:*7*
lawyer  10:*2*
39:*8*
layer  45:*5*
laying  64:*18*
lays  32:*17*
leak  10:*19*
44:*5, 13*  75:*9,*
*16, 18, 21*  76:*8*
leakage  34:*14,*
*16*  43:*20*  77:*15*
leaking  27:*17*
43:*6*  44:*5*  50:*2*
77:*4, 9*  78:*1, 18*
learned  57:*13*
Leave  29:*12, 17*
30:*17*  32:*6*
leaves  31:*15*
32:*19*
leaving  21:*10*
57:*1*
left  36:*7, 8*
56:*14*
legal  26:*10*
lengthy  31:*13*
letting  8:*8*
lettuces  82:*9*
level  12:*4*
21:*19*
levels  22:*18*
liability  61:*14*
62:*14*
life  5:*20*
lift  65:*21*
lifted  48:*12, 15*
49:*4*  56:*8*
light  41:*2*
likewise  19:*12*
70:*13*  77:*10*
Linda  1:*15, 21*
6:*13*  85:*3*
line  50:*4*
LION  1:*7, 12*
2:*17*  4:*20*  5:*5*
6:*1, 6*  9:*18*
10:*1*  11:*17*
12:*8*  16:*6*
18:*19*  20:*10, 12,*
*17*  21:*4, 7*  22:*6*

Case 1:20-cv-02800-JMC   Document 63-8   Filed 04/28/22   Page 92 of 97

Deposition of Keith Parlier                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

23:*19*  26:*5*
28:*5*  44:*18*
49:*3*  51:*3*
56:*11*  65:*5*
70:*11*  71:*19*
73:*15*  74:*4*
77:*21*  78:*17, 18*
79:*17*
**Lion's**  73:*18*
**liquid**  74:*16*
**list**  17:*18*
49:*13*  69:*4*
**listed**  17:*12*
**Listen**  48:*4*
**literally**  56:*5*
**little**  18:*1*  64:*7*
**LLC**  1:*7, 12*
2:*17*  20:*11*
**LLP**  2:*12*
**located**  23:*21*
24:*1*  45:*3*  80:*1*
**location**  13:*16,*
*20*  15:*12*
**log**  26:*16*  27:*12*
**Logan**  13:*10,*
*11, 12*  54:*21*
56:*1, 2, 7, 10*
63:*3*
**logs**  10:*10, 11,*
*12*  11:*1*  27:*13*
51:*4*
**long**  8:*18*
11:*16, 20*  13:*15*
18:*18*  46:*13*
47:*19*  50:*13*
**look**  17:*5*
32:*17*  36:*3*
55:*2, 6*
**looked**  26:*15*
**looking**  17:*8*
33:*17, 19*  40:*17*
41:*18*  47:*4*
66:*11*  68:*20*
**looks**  33:*21*
34:*5*  41:*21*
42:*1*  44:*12*
**lot**  20:*7, 16*
**lower**  26:*4*
64:*7*

**< M >**
**Madam**  8:*7*
**main**  50:*19*
**maintenance**
27:*8*  43:*9, 10*
76:*5*  77:*20*
**majority**  37:*8*
**making**  51:*19*
**manager**  13:*3,*
*8*  23:*2, 4, 7, 12*
26:*8*  32:*5*
36:*15, 16*  54:*14,*
*16, 18*  55:*20*
56:*2*  57:*13*
58:*1*  59:*19*
60:*11, 12, 13*
63:*1, 4*
**mandate**  49:*21*
**manner**  69:*9*
**marked**  41:*17*
86:*11*
**MARYLAND**
1:*2, 15*  2:*6, 14*
3:*6*  85:*1, 3*
**mat**  12:*17*
24:*19*  30:*10*
34:*2, 10, 13, 17*
35:*6*  37:*3*
41:*13*  43:*13*
45:*14*  46:*4, 7, 9,*
*13*  47:*19*  48:*12*
49:*4*  52:*9*
53:*11, 16*  56:*8,*
*11*  58:*14*  64:*6*
71:*6*  72:*4*  73:*5*
74:*16*  75:*5, 6*
76:*12*  77:*11*
81:*20*  82:*2*
**mat/rug**  64:*8,*
*17, 19*
**material**  74:*15,*
*16, 19*
**mats**  21:*2*
43:*16*  44:*17, 20*
45:*1, 2, 4, 11*
46:*11, 15, 19*
47:*8, 15*  48:*15*
52:*2, 3*  72:*11*
73:*2*  76:*7*

77:*13*  79:*3, 9,*
*14, 16*  82:*6*
**mats/rugs**
63:*10, 15*
**matter**  32:*6*
54:*6, 7*  61:*15*
71:*10*  73:*18*
**matters**  25:*18*
**maximized**  17:*6*
**mean**  57:*16*
61:*8*  75:*19*
81:*1*
**meant**  43:*9*
81:*7*  83:*12*
**mechanism**
38:*17*
**Medical**  29:*12*
**medication**  9:*4*
**meet**  4:*21*  5:*1*
**memo**  17:*19*
**mental**  9:*8*
**mentioned**
59:*14*  67:*15*
79:*3, 18*  81:*8,*
*11*  82:*14*
**merged**  20:*18*
**mess**  67:*19*
**middle**  35:*13*
38:*2*
**mind**  17:*8*
**mine**  65:*19, 21*
**Mini**  83:*10, 11,*
*12*
**minor**  44:*5*
**minutes**  56:*5, 6*
**missing**  32:*4*
**misspellings**
83:*5*
**misspoke**  57:*5*
**misunderstandin**
**gs**  83:*5*
**misunderstood**
51:*1*
**moisture**  72:*5*
**moment**  54:*10,*
*11*  76:*1*
**money**  81:*5*
**months**  23:*13*
**mopped**  33:*12*
67:*14*

**mopping**  39:*13*
67:*17*
**morning**  49:*15*
50:*21*  51:*4*
73:*18*
**motor**  37:*20*
38:*17*  77:*12*
**mouse**  35:*12,*
*21*  36:*1, 7*
37:*21*  64:*9*
**move**  25:*4*
35:*21*  46:*8*
**moved**  11:*5*
37:*17*  65:*3*
**multiple**  6:*10*

**< N >**
**name**  4:*14, 17*
5:*10*  8:*9*  21:*15*
23:*14, 15, 16*
44:*19*  61:*5, 16*
**named**  85:*4*
**names**  62:*4*
**narrows**  50:*16*
**nature**  63:*10*
71:*12*
**near**  19:*14*
20:*1*
**necessary**  84:*8*
**need**  7:*11*  8:*17,*
*18, 21*  17:*4, 5*
31:*4*  73:*4*
**needs**  6:*14, 17*
**never**  32:*13*
58:*20*  59:*8, 9*
**new**  22:*10*
**Nice**  4:*21*  5:*1*
**night**  53:*3*
73:*17*
**non-objections**
57:*11*
**normal**  15:*18*
16:*5*
**notarial**  85:*12*
**Notary**  1:*16*
85:*3, 17*
**noted**  69:*17, 20*
**Notice**  5:*3*
15:*3*  25:*15*
35:*5*  78:*4, 12*

**NUMBER**  1:*7*
6:*15*  25:*18*
40:*16*  52:*14*
61:*5*  75:*13, 19*

**< O >**
**object**  7:*9*
47:*1*  63:*21*
73:*6*
**objecting**  57:*7*
**Objection**
24:*21*  25:*1*
39:*4, 5, 7*  45:*7,*
*8*  47:*14*  48:*1, 2,*
*8, 9*  50:*9, 10*
52:*18, 19*  63:*17,*
*18, 20*  73:*13, 21*
74:*3*  75:*2*
**objections**  47:*2*
**obligation**  28:*5*
73:*19*
**O'BRIEN**  3:*3*
25:*1*  39:*5, 7*
45:*7*  47:*1, 14*
48:*1, 8*  50:*9*
52:*18*  63:*18, 20*
73:*6, 13, 21*
75:*2*  80:*11*
82:*20*  83:*11*
**observation**
68:*13, 19*
**observe**  15:*19*
52:*4*  61:*20*
62:*1*
**observed**  7:*6*
17:*21*
**obviously**  43:*2*
**occasion**  75:*17*
76:*2*
**occur**  11:*8*
**occurred**  11:*2,*
*6, 17*  12:*21*
13:*20*  23:*13*
62:*8*  63:*6, 10,*
*14*
**occurring**  7:*6*
**Office**  2:*4*  5:*3*
**officer**  3:*2*
**offset**  35:*6, 15*

Office (410) 821-4888              2201 Old Court Road, Baltimore, MD 21208              Facsimile (410) 821-4889
CRC Salomon, Inc.                    www.crcsalomon.com - info@crcsalomon.com                        Page: 6

Deposition of Keith Parlier                                        Jasmine Rittersbacher vs. Food Lion, LLC, et al.

**Oh** 35:*10, 19*
56:*2* 71:*6*
**Okay** 8:*12, 13*
11:*8* 13:*7, 13,*
*19* 14:*5, 16, 21*
16:*9* 20:*3, 9*
21:*1, 6* 22:*3*
23:*11* 24:*15*
25:*2, 9, 13* 26:*9*
27:*7* 28:*1, 4, 20*
29:*16* 33:*1*
34:*2, 7, 19*
35:*12* 37:*2, 7,*
*11* 38:*15, 21*
39:*20* 41:*20*
42:*18* 43:*1, 5,*
*11* 44:*1, 8, 17*
45:*19* 47:*18*
48:*11* 49:*17*
50:*18* 51:*17*
52:*1, 13* 53:*14*
56:*4* 59:*8* 60:*6*
62:*11* 63:*12*
65:*4, 19* 67:*11,*
*21* 68:*18* 69:*3*
70:*1, 13* 72:*17*
74:*20* 76:*16*
77:*10* 81:*19*
82:*5* 83:*8*
**Old** 1:*14* 47:*16*
**on-boarding**
29:*20*
**once** 60:*3*
**one-on-one** 27:*5*
**ones** 20:*15*
21:*16*
**ongoing** 54:*3*
**open** 29:*9*
**opened** 17:*1*
**operations**
20:*13*
**opportunity**
29:*11* 83:*3*
**order** 27:*12, 13,*
*18* 43:*9, 10*
**ordering** 20:*16*
**orders** 10:*14*
11:*1* 18:*4*
**organization**

22:*10, 12* 79:*6*
**original** 84:*9*
**OSHA** 71:*16,*
*18* 72:*1, 3, 10*
**outcome** 85:*12*
**oversee** 23:*5*

**< P >**
**p.m** 1:*14* 83:*15*
**page** 65:*8* 86:*2*
**paper** 21:*15*
44:*12* 84:*9*
**PARLIER** 1:*13*
4:*9, 15, 17* 5:*11*
8:*11* 17:*14*
25:*13* 37:*19*
52:*13* 58:*9*
64:*1* 66:*6*
78:*21* 80:*20*
83:*2* 84:*15*
85:*4* 86:*3*
**part** 6:*6* 68:*8*
74:*20*
**particular**
11:*16, 20* 19:*16*
40:*8* 52:*9*
**parties** 4:*5*
85:*11*
**partner** 20:*12*
**Paul** 2:*13* 3:*5*
**people** 22:*10*
50:*2* 51:*13*
56:*10* 67:*5*
**perform** 76:*5*
**performance**
29:*10*
**period** 20:*8*
31:*13*
**person** 65:*16*
**personal** 19:*6*
26:*13* 29:*11*
**personally** 12:*1*
60:*8*
**personnel**
25:*11* 62:*17*
**pertaining**
10:*14*
**phone** 61:*5*
**photo** 33:*18*
35:*5* 38:*17*

40:*16* 45:*21*
46:*2* 48:*12*
**photographs**
70:*7, 11, 16*
**photos** 33:*18,*
*19* 41:*17*
**photos-floor**
40:*16*
**phrase** 7:*14*
**phrased** 19:*20*
**physical** 9:*7*
10:*20*
**pic** 26:*3*
**pick** 36:*12, 17*
37:*13* 79:*13*
**picked** 34:*15*
67:*4* 71:*6*
**picture** 33:*15*
34:*8* 35:*8, 9, 13*
43:*12* 44:*8, 15*
52:*20* 53:*20*
56:*9, 14* 75:*12*
76:*10*
**pictures** 25:*10*
26:*3, 18* 32:*12*
61:*1* 70:*19*
**piece** 63:*13*
**pipe** 76:*2*
**place** 34:*17*
47:*20* 79:*9, 13*
82:*13, 14* 85:*4*
**placed** 31:*18*
34:*20* 77:*13*
80:*12* 81:*2*
82:*11*
**placement**
81:*12*
**places** 79:*17*
**Plaintiff** 1:*5*
2:*8* 61:*4, 8*
81:*8*
**plants** 35:*17*
36:*6* 38:*18*
**plastic** 36:*18*
38:*4, 6, 11*
**play** 31:*10*
57:*8*
**Please** 5:*9* 7:*6,*
*12, 13, 16* 8:*4,*

*19* 70:*16* 80:*5*
**pleasure** 25:*13*
**pledge** 28:*21*
**plumbing** 76:*2*
**point** 7:*10, 11*
8:*10* 56:*6* 69:*8*
**pointed** 15:*13,*
*14*
**points** 17:*19*
**policies** 28:*2,*
*10, 14* 30:*13, 19*
**policy** 29:*10*
**poses** 30:*7*
**possibility** 77:*15*
**Possible** 10:*18*
26:*10* 43:*20*
60:*5, 21* 61:*19*
79:*14*
**possibly** 36:*12*
40:*19* 41:*10*
48:*20* 58:*8*
68:*20*
**pots** 36:*4*
**precautions**
47:*20* 59:*4*
**prepare** 9:*20*
17:*18, 20* 60:*20*
**prepared** 9:*11*
26:*2, 12* 71:*12*
**presence** 85:*9*
**present** 67:*11*
69:*6*
**presumably**
6:*10*
**pretty** 8:*14*
**prevent** 9:*4*
31:*17* 34:*14*
50:*8* 81:*7*
**preventing**
72:*13* 73:*3*
**primary** 73:*19*
**prior** 25:*9* 78:*5*
**probability** 79:*8*
**probably** 31:*18*
70:*4*
**problem** 17:*7*
**problems** 6:*16*
**proceedings**
85:*7*
**process** 29:*21*

**produce** 15:*7, 8,*
*9, 13, 20* 16:*7*
19:*14* 20:*4*
23:*8, 12* 24:*4*
26:*1* 41:*19, 20*
43:*17* 49:*18*
58:*21* 64:*17*
77:*14* 82:*2, 6*
**product** 20:*15*
77:*15*
**production**
16:*11* 25:*19*
**programs** 20:*17*
**progress** 22:*12*
**prohibit** 9:*8*
**pronounced**
4:*15*
**proper** 54:*12*
55:*9*
**properly** 47:*15*
67:*20*
**protect** 80:*9, 14,*
*21*
**provide** 21:*17*
32:*11* 33:*4*
34:*17* 46:*9, 10*
54:*12* 72:*11*
76:*4* 80:*10, 11,*
*13*
**provided** 18:*1*
26:*20* 27:*11, 12,*
*15, 20* 33:*9*
53:*6* 55:*9*
76:*13*
**provides** 35:*2*
44:*17, 20* 48:*17*
51:*9* 52:*3*
59:*21*
**providing** 43:*9*
54:*8*
**Public** 1:*16*
22:*21* 28:*6*
30:*8* 50:*8*
59:*15* 85:*3, 17*
**pull** 17:*3* 18:*5*
36:*19* 47:*8*
**pulled** 25:*11*
37:*17* 53:*16*
56:*11*

Deposition of Keith Parlier                                      Jasmine Rittersbacher vs. Food Lion, LLC, et al.

pulling   56:*20*
75:*5*
pulls   34:*21*
punctuality
29:*13*
purpose   15:*17*
34:*12*   80:*4, 6*
purposely   58:*6*
purposes   12:*11*
55:*5*
pushing   68:*8*
69:*5*
put   13:*16, 17*
27:*13, 18*   31:*15*
37:*3*   38:*5, 10,*
*11*   44:*3, 11, 13*
70:*4*   71:*6, 7*
75:*20*   77:*11*
79:*3, 10, 16*
putting   56:*13,*
*21*   75:*6*   76:*7,*
*12*

< Q >
QA   49:*13*
quality   49:*14*
51:*2*   55:*5*
question   7:*8,*
*19, 20*   8:*20*
15:*18*   25:*20*
35:*5*   45:*18*
47:*6*   64:*2*   68:*6*
79:*1, 20*   80:*5*
question/answer
7:*10*
questioning
18:*2*
questions   27:*1*
59:*9, 14*   70:*15*
80:*17*   82:*20*
quick   79:*1*
quickly   28:*20*

< R >
rags   42:*9, 19*
75:*20*
raise   46:*12*
raised   25:*18*
ran   33:*12*

RBS   20:*11, 12,*
*18, 19*   21:*4*
22:*1*
read   26:*15*
83:*3*   84:*3*
reading   4:*6*
29:*19*   64:*21*
ready   58:*19*
real   28:*20*
really   40:*2*
41:*1*
reask   47:*6*
80:*5*
reason   8:*18*
9:*10*   50:*18, 19*
75:*12*
recall   20:*6*
76:*16*
recalled   79:*20*
receive   23:*6*
receiving   23:*5*
recognize   73:*11*
recognized   54:*8*
recognizing
66:*12*
recollect   55:*17*
recollection
61:*17*   77:*3*
record   5:*10*
16:*5*   33:*17*
35:*4*   38:*2, 16*
40:*15*   66:*3, 4*
72:*21*   83:*13*
84:*5*   85:*7*
recorded   6:*18,*
*19*   85:*7*
recording   6:*20*
records   26:*16*
Recruit   22:*10*
recruiter   22:*7*
red   6:*19*   36:*4*
69:*13*
redaction   62:*17*
refer   21:*19*
references   61:*7*
reflect   11:*20*
50:*5*
reflecting   41:*2*

refrigerated
11:*12, 15*   12:*14*
20:*1, 20*   34:*10*
refrigeration
11:*2*   35:*7*
37:*20*
regarding   62:*5*
71:*5*   76:*17, 21*
78:*17*   81:*12*
regardless
59:*18*   75:*15*
regional   22:*7*
register   81:*3*
registers   81:*6*
related   85:*11*
relating   11:*1*
19:*21*   26:*2*
54:*4*   78:*12*
relationship
20:*9*   21:*6*
remedial   71:*12*
remember
15:*11, 12*   23:*16*
44:*19*   46:*2*
55:*15*   59:*13, 15*
76:*20*   77:*7*
remembering
21:*9*
remove   72:*5*
removed   58:*14*
repair   10:*20*
11:*1*   27:*18*
repairs   10:*15,*
*17*   27:*8, 14*
repeat   16:*2*
rephrase   7:*18*
30:*9*   48:*3*
replaced   49:*5*
report   13:*6, 7*
55:*12*   59:*6*
60:*15, 17*   62:*1,*
*11, 12, 14, 16, 20*
64:*3*   69:*9*
Reported   1:*20*
63:*3, 8*
reporter   6:*14*
8:*7*   83:*9*
represent   4:*18*
represents   9:*17*

request   16:*11*
25:*19*
required   60:*14,*
*19, 20*
requires   72:*1*
resistant   72:*11*
resolved   73:*5*
Respect   29:*4*
respective   4:*5*
respond   68:*21*
responding
59:*20*
response   5:*2*
responses   58:*3*
responsibility
39:*10*   67:*8*
responsible
22:*13*   23:*3*
result   19:*13*
Retail   20:*10, 13*
returned   59:*2*
review   10:*6*
14:*8*   24:*16*
28:*11*   78:*8*
83:*4*
reviewed   10:*4,*
*7, 13, 21*   25:*14*
26:*1*   57:*4*
Rhoden   23:*15,*
*18*
R-H-O-D-E-N
23:*15*
right   7:*5*   8:*2*
9:*3*   10:*21*
11:*19*   12:*12, 15*
16:*14*   17:*14*
18:*18*   24:*2, 5,*
*12*   27:*1*   29:*14*
30:*17, 20*   31:*7*
32:*11*   35:*21*
36:*3*   37:*14*
39:*11*   40:*6, 12,*
*15, 21*   41:*16*
42:*2, 3, 5, 12*
43:*15*   45:*4*
46:*15, 18*   48:*18*
49:*2*   50:*13, 21*
52:*7*   53:*1, 15*
54:*18*   55:*7*

65:*8*   81:*17, 18,*
*20*   82:*7*
RITTERSBACH
ER   1:*4*   4:*19*
12:*16*   14:*17*
19:*10*   24:*6*
27:*19*   31:*12*
32:*18*   42:*13*
45:*20*   48:*13*
54:*15*   68:*11*
Road   1:*14*
18:*13*
roll   49:*19*
rolled   34:*1, 3*
40:*18*
roof   10:*19*
rough-housing
63:*14*
Roughly   5:*18*
38:*1, 20*
rug   11:*5*   12:*17*
14:*18*   25:*3, 8,*
*11*   34:*1, 2*
36:*10*   37:*9*
38:*3*   40:*18, 20,*
*21*   46:*4*   64:*6*
67:*5*   75:*8*
rules   7:*1*
running   63:*14*
75:*5*

< S >
safe   22:*21*
28:*6*   32:*3*
46:*20*   54:*5, 12*
59:*5*   72:*1*
73:*20*   74:*5*
safer   33:*4, 7*
48:*6*
safest   47:*19*
76:*4, 6*
safety   28:*1*
29:*9, 18*   30:*4*
39:*1, 2*   46:*9*
59:*4, 15*   73:*11*
80:*13*
Salomon   1:*14*
save   64:*11*
saw   24:*17*
56:*11, 14*   68:*15*

Deposition of Keith Parlier                                                      Jasmine Rittersbacher vs. Food Lion, LLC, et al.

saying  12:*13*
32:*4*  36:*21*
53:*12*
says  6:*19*
16:*16*  49:*3*
62:*20*  63:*8*
64:*3, 5, 7, 15*
67:*21*  68:*9*
69:*19*  70:*8, 14,*
*18*
school  18:*7*
screen  6:*10*
16:*16*  25:*16*
40:*13*  62:*18*
81:*14*
scrubber  33:*12*
seal  85:*12*
sec  16:*15*  53:*21*
second  10:*8*
13:*8*  18:*2*  22:*6*
28:*18*  43:*12*
66:*1*  68:*7*  70:*2*
72:*20*
section  49:*19*
59:*1*  64:*17, 18*
82:*8, 11*
secured  33:*4*
see  6:*19*  8:*15*
16:*16*  21:*14*
25:*16*  27:*21*
30:*5, 13, 15*
31:*5*  32:*8, 16*
33:*14*  34:*3*
35:*9, 10, 11, 12,*
*15*  36:*1*  40:*13,*
*19*  41:*5*  42:*5, 8*
46:*3*  52:*13*
53:*15, 20*  54:*6,*
*8*  55:*3, 6*  57:*19*
62:*17*  64:*9, 21*
65:*1, 2, 3, 9*
67:*5*  81:*13, 20*
82:*7*
seen  5:*7*  14:*21*
15:*4*  25:*10, 12*
26:*18*  27:*12*
31:*7*  32:*13*
37:*13*  49:*11*
sense  35:*16*

48:*5*
sent  18:*3*
separate  84:*8*
Service  3:*9*
21:*8, 14, 16, 18*
48:*16, 17, 19*
51:*9, 10*  75:*4*
77:*19*
Services  2:*18*
20:*10*  39:*19*
40:*10*
set  85:*4*
sheet  84:*8*
shiny  33:*21*
34:*4*  41:*9*
Shoplifting
29:*8, 13*
shopping  68:*8*
69:*5, 7*
short  20:*8*
show  16:*14*
25:*15*  32:*12*
33:*14*  34:*8*
40:*12*  41:*16*
46:*1*  57:*9*
62:*15*  81:*13*
showed  44:*9*
45:*20*  75:*12*
shows  14:*17*
31:*11*  32:*14*
49:*9*  57:*6*
sign  28:*15*
31:*15, 17*  32:*11*
42:*6, 9, 19*
44:*11*  56:*13*
83:*3*
signature  16:*17*
signed  16:*18*
17:*2*  60:*17*
signing  4:*6*
signs  33:*11*
49:*20*  67:*11*
76:*14*
similar  19:*6*
75:*13*  79:*15*
simply  72:*4*
sir  18:*11*  33:*15*
sit  9:*10*  12:*7*
27:*16*  31:*10, 12*

42:*11*  68:*10*
sitting  68:*15*
situation  32:*10*
situations  74:*9*
six  23:*12*  31:*18*
size  76:*8*
slide  24:*19*
slimy  24:*18*
52:*16*
slip  11:*4*  31:*12*
72:*11*
slipped  4:*20*
12:*17*  20:*4*
58:*12*  64:*19*
slipperiness
75:*7*
slippery  24:*18*
25:*3*  45:*12, 15*
slipping  14:*18*
19:*14, 21*  47:*11,*
*13*
slips  72:*13*
73:*3*
soak  34:*18*
76:*10*
somebody
19:*14, 21*  20:*4*
24:*17*  28:*9*
37:*2*  39:*21*
44:*2, 3*  46:*16*
49:*10*  51:*19*
58:*12*  63:*13*
64:*12*  66:*12*
67:*1*  68:*10, 15*
70:*10, 11*  77:*19,*
*20*
somewhat  14:*3*
soon  24:*5*
57:*13*
sorry  6:*4, 20*
12:*6*  13:*5, 12*
17:*1*  31:*16*
34:*19*  35:*10*
47:*3*  63:*19*
65:*4*  72:*18, 19*
sound  7:*21*
29:*14*
sounds  29:*15*
source  14:*14*

73:*3*
sources  75:*4*
speak  26:*19*
27:*14*  42:*21*
59:*2*
specifically
19:*21*  26:*2*
33:*2*  42:*5*  52:*2*
78:*4, 12*  81:*12*
speculate  53:*4,*
*5*  74:*18*
speculation  53:*7*
spelled  8:*12*
spill  51:*15*
spoke  24:*14*
77:*20*
spoken  13:*3*
24:*13*  26:*19*
58:*16*
sprayed  79:*12*
82:*10*
sprayers  35:*16*
squished  50:*1*
St  2:*13*  3:*5*
stand  38:*3*
start  5:*9*  28:*4*
39:*6*
starts  60:*4*
state  5:*10*
72:*15*  85:*1, 3*
stated  72:*9, 16*
statement  80:*21*
statements  71:*4*
STATES  1:*1*
72:*3, 10*
stating  10:*11*
stenographically
85:*7*
stepped  64:*17*
sticky  46:*16*
stipulated  4:*4*
STIPULATION
S  4:*3*  85:*7*
stop  7:*16, 17*
8:*16*  39:*2*  44:*4,*
*5, 13*  47:*21*
store  4:*20*
10:*11, 16, 20*
11:*6, 17, 21*
15:*16*  16:*6*

19:*10, 13, 16*
21:*19*  22:*17, 19*
23:*1, 4*  24:*1, 7,*
*8, 9*  25:*11*  26:*7,*
*8*  28:*2, 6*  31:*1*
36:*14*  37:*12*
38:*7*  41:*12*
49:*12*  51:*2, 18*
54:*5, 16*  59:*17*
60:*4*  63:*1*
73:*20*  74:*5, 12*
76:*3*  79:*7*  80:*2,*
*7, 9*
stores  19:*19*
21:*18*  40:*4*
51:*5*  79:*17*
80:*11*
straight  37:*18*
64:*20*
strategic  81:*12*
strategically
77:*13*  79:*4, 9,*
*10*  80:*12*
Street  2:*5, 13*
3:*5*
strike  15:*17*
subcontractors
40:*4, 8*
submit  60:*15*
subsidiary  6:*2,*
*5*
substance
27:*17*  30:*11*
32:*12, 14*  34:*1,*
*4, 6*  35:*20*
40:*20*  41:*5, 6, 8,*
*9, 10, 13*  44:*10*
45:*14, 17, 19*
46:*4, 6*  47:*10,*
*11*  52:*17, 21*
53:*2, 10*  56:*12*
61:*1, 2, 21*
63:*15*  64:*4*
substances
45:*11*
Suite  3:*5*
supposed  7:*2*
23:*6*  28:*15*
46:*10*  54:*4*
61:*19, 21*

sure  6:*15*, *17*
7:*1*, *19*  8:*5*, *9*
11:*12*  16:*3*
20:*9*  22:*20*
30:*7*, *10*  33:*6*
43:*7*  45:*19*
47:*7*  50:*1*
51:*19*  53:*8*
54:*12*  55:*8*, *11*
59:*5*, *16*  66:*21*
76:*13*
surface  72:*12*
surveillance
69:*20*  70:*15*
80:*1*, *6*, *8*
swept  66:*16*
67:*2*
switch  81:*5*
sworn  4:*10*
85:*5*
system  59:*7*

< T >
take  8:*17*, *19*,
*21*  26:*11*  31:*13*
38:*5*  60:*21*
61:*1*  75:*20*
taken  1:*13*
14:*6*  25:*10*
50:*3*  70:*8*
71:*13*
talk  7:*7*, *12*, *13*
14:*10*  15:*3*
24:*9*  40:*7*
54:*19*, *21*  55:*6*
72:*18*
talked  29:*19*
talking  11:*3*
17:*19*  25:*14*
35:*4*  49:*17*, *20*
58:*19*  60:*12*
61:*10*  62:*12*
81:*9*
talks  29:*18*
69:*12*
tear  52:*5*
telephone  29:*13*
tell  4:*10*  9:*13*
16:*18*  31:*11*, *14*,
*18*  33:*19*  34:*4*

40:*16*  41:*1*, *17*
52:*16*, *20*  56:*8*
81:*16*
telling  26:*3*
31:*21*  57:*7*
tells  39:*9*
50:*12*  64:*4*
temporary  72:*4*
Terracotta  36:*5*
tested  28:*12*
testified  4:*11*
testify  9:*11*
testifying  9:*4*
testimony
14:*11*  84:*5*
Thank  38:*21*
50:*18*  82:*18*
theft  81:*4*
thing  18:*5*
26:*14*  32:*3*, *16*
47:*19*  53:*8*
55:*7*  59:*16*
60:*2*  73:*12*
81:*11*
things  10:*18*
15:*2*  26:*10*
30:*1*  49:*19*
51:*14*, *15*, *20*
74:*21*  78:*3*, *11*
82:*10*  83:*6*
think  9:*11*
58:*11*  69:*3*, *4*
75:*13*
third  25:*20*
thought  47:*3*
51:*11*  81:*7*
threat  30:*7*
three  47:*7*
tile  35:*3*  37:*5*,
*7*, *15*, *18*  41:*3*
45:*12*
time  6:*3*, *4*, *7*, *8*
7:*14*  8:*7*  13:*3*,
*9*, *19*  16:*3*  20:*8*
26:*8*, *12*, *14*
31:*13*  37:*11*
41:*11*  43:*16*
46:*11*  48:*19*
49:*4*  54:*16*
58:*10*  60:*14*

64:*12*  66:*15*
67:*1*, *4*, *14*
74:*11*  85:*4*
times  5:*16*, *18*
6:*21*  58:*10*, *12*
title  22:*6*
titled  62:*16*
today  5:*2*  9:*5*
19:*7*  25:*10*
today's  9:*21*
told  44:*1*
50:*19*  56:*6*, *16*
59:*3*  77:*21*
top  33:*13*  34:*1*
47:*12*  75:*6*
81:*18*
topics  21:*12*
40:*6*
torn  47:*8*
towels  44:*12*
75:*20*  76:*9*
traffic  72:*6*
trained  30:*5*
44:*21*  45:*2*
50:*15*
training  22:*13*,
*16*, *20*  23:*3*, *6*
24:*3*  27:*3*, *5*
28:*9*, *13*, *17*, *19*
30:*2*, *3*, *4*  31:*3*,
*6*  54:*3*, *11*
71:*21*  73:*9*, *10*
transcript  83:*4*
84:*4*, *9*  85:*7*
Trebach  2:*12*
trip  46:*16*
61:*20*
tripping  47:*9*,
*12*
true  5:*20*  84:*5*
85:*7*
truth  4:*10*, *11*
9:*14*
truthfully  9:*5*
try  7:*7*  44:*13*
61:*12*, *15*
trying  18:*5*
55:*16*  64:*11*
turn  74:*8*

Two  18:*8*
56:*10*  59:*8*, *11*,
*14*
twofold  6:*15*
type  6:*17*  81:*5*
typed  71:*11*

< U >
uh-huh  8:*3*
underlying  73:*4*
underneath
24:*19*  30:*11*
36:*19*  42:*20*
45:*11*, *15*  47:*10*
48:*13*, *16*  63:*15*
64:*8*  75:*8*, *10*
understand  5:*5*
7:*2*, *15*  8:*6*  9:*1*,
*13*, *16*  28:*8*
31:*3*  64:*1*
understanding
20:*16*  22:*4*
51:*12*  57:*12*, *21*
70:*12*
understood  7:*20*
unit  11:*2*, *13*,
*15*, *16*  12:*8*, *12*,
*14*, *18*  19:*15*
27:*9*, *13*, *14*, *17*
34:*10*  35:*6*, *7*,
*17*  37:*20*  40:*19*
42:*12*, *16*, *20*
43:*6*  50:*2*  75:*9*,
*13*  77:*4*, *12*, *21*
78:*18*
UNITED  1:*1*
units  20:*1*, *20*
75:*16*  79:*10*
unknown  68:*9*
unsafe  30:*6*, *14*
31:*4*, *20*  54:*9*
58:*3*, *5*, *7*  76:*15*
use  7:*14*  8:*3*
29:*10*, *13*  44:*21*
usually  8:*8*, *14*
75:*18*

< V >
vacation  55:*17*
57:*14*

Vane  3:*9*  40:*9*
77:*17*, *18*, *19*
Vane's  78:*8*, *17*
vase  11:*10*
vegetables
79:*11*  82:*9*
vendor  50:*20*
74:*12*, *17*
vendors  73:*16*
versus  46:*20*
viable  73:*3*
vicinity  15:*15*,
*20*
video  14:*17*, *20*,
*21*  15:*3*, *4*  31:*8*,
*11*  32:*16*  55:*2*
56:*7*  57:*4*, *6*
61:*2*, *3*  66:*12*
68:*21*  70:*2*, *4*, *5*,
*16*, *20*  81:*13*
82:*4*, *8*
Videoconference
1:*11*
videos  26:*18*
view  65:*11*
66:*7*
visual  68:*13*, *18*
vs  1:*6*  38:*4*

< W >
waived  4:*7*
walk  30:*18*
38:*12*
walked  31:*4*
56:*15*  65:*19*
walking  31:*17*
64:*16*  72:*12*
wall  79:*11*
want  7:*1*, *12*,
*17*, *18*  16:*14*
22:*11*  34:*7*
57:*8*  81:*13*
82:*21*
wants  65:*5*
warning  67:*11*
warnings  78:*5*
warp  46:*11*
watch  14:*8*
watched  70:*2*, *3*

Deposition of Keith Parlier                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

watching  8:*14*
56:*7*
water  27:*17*
34:*14, 16, 18*
35:*2, 17*  36:*9,*
*20*  37:*3, 14, 18*
43:*7, 20*  47:*21*
49:*19*  50:*4*
64:*8*  67:*6*  75:*9*
77:*14, 15*  79:*8*
82:*10, 15*
way  6:*9*  16:*9*
17:*15*  19:*2, 19*
38:*3*  41:*2*  43:*1,*
*5*  48:*6*  65:*5*
71:*6*  85:*12*
wear  52:*5*
Webb  13:*10*
weekly  52:*4*
well  15:*3*
22:*14*  27:*2*
28:*4*  32:*8*
36:*15*  57:*18*
61:*10, 14*  63:*18,*
*21*  66:*18*  74:*20*
81:*2*
went  12:*9*  20:*7,*
*17*  21:*3, 4*
24:*20*  58:*13*
66:*14*
we're  19:*7*
26:*11*  33:*17*
35:*4*  40:*17*
41:*17*  57:*10*
61:*19, 21*  68:*15*
wet  30:*11*
32:*10, 14*  33:*10,*
*11*  34:*5*  36:*12*
40:*20*  41:*10*
42:*6, 8, 19*  43:*2*
44:*11*  61:*21*
64:*4*  75:*7*
76:*13*  79:*11, 12*
82:*8, 9*
wetness  33:*10*
window  17:*5*
witness  4:*7*
47:*3*  83:*8*
85:*12*  86:*2*

witnesses  54:*19*
62:*4*  71:*3*  86:*1*
woman  58:*21*
word  7:*14*  8:*12*
wording  72:*18,*
*19*
words  7:*17*  8:*3*
work  10:*11, 12,*
*14, 21*  13:*14*
18:*4*  22:*11*
23:*2*  27:*12, 13*
39:*21*  40:*1, 5*
43:*9, 10*  51:*3*
worked  41:*12*
worker  30:*10,*
*12*  77:*20*
workers  30:*8*
53:*14*  71:*14*
Working  29:*2*
workplace  29:*4*
worn  47:*8*
write  66:*7*  84:*8*
written  17:*21*
69:*16*  71:*3, 5, 8*
wrong  17:*2*
23:*16*

< Y >

year  14:*3*  19:*1*
42:*3*
years  18:*8, 20*
20:*18*  55:*16*
59:*11*
yellow  56:*13*
71:*7*

< Z >

Zoom  6:*9*
zoomed  41:*4*