1    Okay. So I know that there has been changes
2 in the store. And one of the changes was the changing
3 of the video recording machines, the cameras, correct?
4    **A    Yes.**
5    Q   And did you prepare, like, a list of talking
6 points to help you today?
7    **A    No.**
8    Q   Okay. You just -- you know what you know, and
9 you're here to talk about it?
10   **A    Yes.**
11   Q   All right. Where were you born?
12   **A    Easton, Maryland.**
13   Q   And how long have you worked at Food Lion?
14   **A    Combined, it will be going on 14 years.**
15   Q   Okay. Let's break it down, because you said
16 combined.
17       There was a gap in there, I assume?
18   **A    Yes. I left for a year to go -- I lived in**
19 **Florida for a year and went to college, and then I came**
20 **back. And it was about a six or seven months interval**
21 **until I came back to the company.**
22   Q   Okay. So just give me an idea. When did you
23 start working for Food Lion? What year?
24   **A    2007.**
25   Q   And when did you go to Florida?

Deposition of Logan Fox                                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

Case 1:20-cv-02800-JMC   Document 67-1   Filed 05/18/22   Page 2 of 10

```
 1      A    If it was, I don't know.  It could have been
 2   sweating.  It was, you know, summertime.
 3      Q    Right.  Let me take a step back.  So maybe on
 4   that particular day.
 5           You've had issues with that machine sweating
 6   or leaking prior to June 18th, 2019, correct?
 7           MR. DAVEY:  Objection.  Go ahead.
 8   BY MR. GREENBERG:
 9      Q    You can answer.
10      A    Not that one in particular, but others.
11      Q    Okay.  And specifically, when you have
12   problems, it's best to repair the unit, not just put a
13   mat down, correct?
14           MR. DAVEY:  Objection.  Go ahead.
15           THE WITNESS:  We put a work order in, and a
16       maintenance guy comes out.
17   BY MR. GREENBERG:
18      Q    Okay.  And you would agree with me -- well,
19   strike that.
20           What is -- do you believe that -- now that
21   you're an assistant manager, do you believe that safety
22   is everyone's job?  It's not just the manager's job,
23   correct.
24           MR. DAVEY:  Objection; calls for an opinion.
25       Go ahead.
```

1      A    A cooler.

2      Q    A cooler.  There's a cooler that's either
3 leaking or sweating.  But either way -- and I understand
4 what you mean, but what do you mean by sweating?

5      **A    Condensation.  Like, in the summertime, you**
6 **know, our bodies get hot, and we sweat.**

7      Q    Okay.  So what does the unit do when it
8 sweats?

9           MR. DAVEY:  Objection.  Go ahead.

10 BY MR. GREENBERG:

11     Q    If you know?

12     **A    I don't know really.**

13     Q    Water comes out of it?

14     **A    It would come from the bottom sometimes.**

15     Q    Right.  And what's on the bottom?  What's it
16 resting on?

17     **A    The floor.**

18     Q    Okay.  So the water would come out, and it
19 would go on the floor, correct?

20     **A    Yes.**

21     Q    All right.  Just so that I know, because I've
22 seen the video.  And I don't have tons of pictures.  I
23 have some.  And we'll go over the pictures in a second.

24          Did you have mats in front of every single
25 cooler throughout the store?

Deposition of Logan Fox — Jasmine Rittersbacher vs. Food Lion, LLC, et al.

Case 1:20-cv-02800-JMC   Document 67-1   Filed 05/18/22   Page 4 of 10

1    A    No.

2    Q    Why?

3    A    They are only designated for the produce area.

4    Q    Okay. Did you have mats in front of every
5    single cooler in the produce department?

6    A    They stretch -- they're long mats, so they
7    stretch. There may be a couple of small sections that
8    are not covered.

9    Q    Okay. And that's because these units sweat?

10   A    No.

11   Q    Why? Sorry. Why do you have the mats?

12   A    So we take out -- so the process of crisping a
13   wet wall, we're dealing with wet produce -- the floral
14   is right there -- they do sit in water.

15   Q    So explain -- oh, so it's there because you
16   know water will come out?

17   A    Not necessarily know that it will come out, but
18   just in case it does.

19   Q    Okay. Just based on experience, doing this
20   day in and day out, you know that it can come out, and
21   therefore you put the mat there?

22   A    Yes.

23   Q    I got it. Do you agree that if a piece of
24   equipment has an issue -- hypothetically, you know, has
25   a sharp edge on it that poses a risk to the workers or

Office (410) 821-4888
CRC Salomon, Inc.
2201 Old Court Road, Baltimore, MD 21208
www.crcsalomon.com - info@crcsalomon.com
Facsimile (410) 821-4889
Page: 28

Deposition of Logan Fox                                                                                                   Jasmine Rittersbacher vs. Food Lion, LLC, et al.

Case 1:20-cv-02800-JMC   Document 67-1   Filed 05/18/22   Page 5 of 10

```
 1   to customers -- that it's the job of the store
 2   management to communicate the problem to --  not only
 3   the staff, not only possibly corporate, or you said
 4   submit a work order, do you believe that they also have
 5   a duty to the customers to be mindful so as not to hurt
 6   themselves?
 7         A    Yes.
 8              MR. DAVEY:  Objection; calls for speculation go
 9         ahead.
10   BY MR. GREENBERG:
11         Q    I'm sorry, say your answer.
12         A    Yes.
13         Q    Okay.  And do you agree that a key principle
14   of a company safety structure is an operator's EEA?
15   Have you ever of that?  Education, expectation, and
16   accountability?
17              MR. DAVEY:  Objection.  Go ahead.
18              THE WITNESS:  I'm not sure really what that is.
19   BY MR. GREENBERG:
20         Q    Okay.  Well, you educate people, right?
21         A    Yeah.
22              MR. DAVEY:  Objection.
23   BY MR. GREENBERG:
24         Q    You create expectation?  You let them know
25   what is expected of the staff?
```

Deposition of Logan Fox                                                          Jasmine Rittersbacher vs. Food Lion, LLC, et al.

Case 1:20-cv-02800-JMC   Document 67-1   Filed 05/18/22   Page 6 of 10

```
 1   BY MR. GREENBERG:
 2       Q    Okay.  I want to go back.  You talked about
 3   Uni-First.
 4            Whose decision was it to pick that particular
 5   mat that was in front of the cooler on the day she fell?
 6   Ms. Rittersbacher fell?
 7            MR. DAVEY:  Objection.  Go ahead.
 8            THE WITNESS:  To pick that mat?
 9   BY MR. GREENBERG:
10       Q    Yeah, that type of mat?  You know what mat I'm
11   talking about, right?
12       A    Yes.
13       Q    You described it.  You saw it.
14       A    Those are the same mats that the company has
15   been using probably before I even started working there.
16       Q    Sure.  Are there any holes -- it's a plastic
17   mat that has like a fiber material on top, correct?
18       A    Correct.
19       Q    Okay.  But on the bottom, it's just straight
20   plastic, correct?
21            MR. DAVEY:  Objection.  Go ahead.
22            THE WITNESS:  Yes.
23   BY MR. GREENBERG:
24       Q    Okay.  So if there's something wet underneath,
25   it becomes slippery?
```

```
 1       Q    Can you see that now?
 2       A    Yes.
 3       Q    Okay.  You can see the mat has been rolled
 4  back?
 5       A    Yes.
 6       Q    And there's a substance underneath?
 7       A    Yes.
 8       Q    Okay.  Is that what it looked like the day
 9  Ms. Rittersbacher fell?
10       A    I'm going to assume so.  If that's the date
11  from the incident, then.
12       Q    Sure.  I don't want you to assume anything.
13            Do you have a recollection that that's what it
14  looked like when you pulled back the mat?
15       A    I believe so.
16       Q    Okay.  I'd like to show you the next --  do
17  you see this (indicating)?  There's a gentleman standing
18  here bent over?
19       A    Yes.
20       Q    Okay.  Who is this gentleman?
21       A    That is Ryan Elliot.
22       Q    All right.  And do you know when these
23  pictures were taken?
24       A    No.
25       Q    All right.  And likewise, you don't know who
```

| | |
|---|---|
| 1 | MR. O'BRIEN: Objection. |
| 2 | THE WITNESS: She just seemed like she was in a |
| 3 | little bit of pain. |
| 4 | BY MR. GREENBERG: |
| 5 | Q   Okay.  Do you recall if she cried? |
| 6 | **A   No.  I don't recall.  I mean --** |
| 7 | Q   That's fine.  And again, it's been two plus |
| 8 | years.  What safety checks, if any, do you all -- and |
| 9 | I'm talking you all meaning Food Lion employees -- have |
| 10 | on a unit that you has sweat before or leaked before? |
| 11 | What safety checks do you have when you open up your |
| 12 | store to the public? |
| 13 | MR. DAVEY: Objection.  Go ahead. |
| 14 | THE WITNESS: I don't really know how to answer |
| 15 | that. |
| 16 | BY MR. GREENBERG: |
| 17 | Q   You know what a safety check is, right? |
| 18 | **A   I do.** |
| 19 | Q   Okay.  Do you have any safety checks for when |
| 20 | you know a particular unit has had issues to go and |
| 21 | check on it to make sure that more people don't hurt |
| 22 | themselves? |
| 23 | MR. DAVEY: Objection. |
| 24 | BY MR. GREENBERG: |
| 25 | Q   Or you know, the staff?  The people -- the |

```
 1   employees of Food Lion also, not just the public?
 2           MR. DAVEY:  Objection.
 3           THE WITNESS:  So I mean, there was no safety
 4       check, no.
 5   BY MR. GREENBERG:
 6       Q   Okay.  After this, did you report the leaking
 7   unit to -- you said online, like digital.
 8           Did you put in a work repair order?
 9       A   I don't remember.
10       Q   All right.  And if you did, that would be
11   where?  I mean, how do I find that?
12       A   I couldn't tell you.
13       Q   Or how would I normally find it?  Like, if
14   today you went in to work and put in a work order, how
15   could I find that?
16       A   You personally, not being a Food Lion employee,
17   employee, you would have to call corporate.
18       Q   I'll give another step.  Well, okay.  So
19   corporate would have access if you put in a work order?
20       A   I would assume so.  I'm not 100 percent sure.
21       Q   All right.  And I'm asking you to go back in
22   time.
23           Do you recall putting in a work order for this
24   unit?
25           MR. DAVEY:  Objection; asked and answered.
```

Deposition of Logan Fox                                                    Jasmine Rittersbacher vs. Food Lion, LLC, et al.

Case 1:20-cv-02800-JMC   Document 67-1   Filed 05/18/22   Page 10 of 10

1   **A    I was, but I don't recall getting mats or**
2   **asking for mats.**
3       Q    Okay.  Listen, I'm not trying to place
4   anything on you.  Understand that.  I just want to know.
5   You see something's under this mat, whose job -- walk me
6   through if this happened right now, okay?  What would
7   you have done, right now, if you were at work.  You saw
8   this gunk underneath the mat, what would you have done
9   differently than you did on June 18th, 2019?
10           MR. O'BRIEN:  Objection.
11           MR. DAVEY:  Objection.  Go ahead.
12           THE WITNESS:  If it were to happen right now, I
13       would probably roll the mat up, run the floor
14       machine underneath of it, and put the mat back down.
15       Q    Okay.  And I assume -- and I'm not putting
16   words in your mouth -- but you would have wiped the
17   bottom of that mat because it's just plastic?
18           MR. DAVEY:  Objection.
19           THE WITNESS:  It's --
20   BY MR. GREENBERG:
21       Q    Would you have wiped it?
22       **A    It's rubber.**
23       Q    What did I say?  Plastic?
24       **A    Yes.**
25       Q    I meant rubber.  It's not a coarse material.